Argued and submitted January 10; judgment on elder financial abuse claim
reversed and remanded, otherwise affirmed November 30, 2022

Ron ADELSPERGER;
Sally Adelsperger;
Walter Arnold; Sandy Arnold;
Larry Brewer; Marilyn Brewer;
James Brown; Lonna Brown;
Bill Burgess; Jane Burgess; Shirley Calkins;
Jerry Christensen, aka Gerald Christenson;
Cindy Christensen, aka Cynthia Evans-Christenson;
Russell Cobb; Norma Cobb; Ron Ellis; Sallie Ellis;
Amy Flickenger Pierpoint, aka Amy Flickenger-Pierpoint;
Glen Pierpoint; Mike Fredrickson; Tresea Fredrickson;
David Fulcer; Sarah Fulcer;
Jack Gibson; Sharon Sue Gibson, aka Sue Gibson;
Mary Gray; Rudolph Hanna; Brenda Hanna;
Gerald Hastings, aka Jerry Hastings;
Shirley House; Michael Huntley; Gloria Huntley;
Rodney Hyde, aka Rod Hyde; Patricia Hyde;
Johnnie Issacs, aka Johnnie Isaacs;
Rowina Issacs, aka Rowena Isaacs;
Don Johnson, aka Donald Johnson; Linda Johnson;
Robert Kasmar; Linda Kasmar;
Kraig Knutson; Barbara Knutson;
Tom Kuntz; Brenda Kuntz;
Richard Mathis; Linda Mathis;
Gary McCord; Marie McCord; David McReynolds;
Joseph Moore; Geraldine Moore;
Adam Morgan; Vicky Morgan, aka Victoria Morgan;
Thomas Noel; William Oar;
Donald Partridge, aka Don Partridge;
Lucille Partridge, aka Lucy Partridge;
Craig Pedersen; Cheryl Pedersen;
David Smith; Carol Smith;
William Thomas, aka Bill Thomas; Jackie Thomas;
Fred Waidtlow; Linda Waidtlow;
Gary Wayman; Charlotte Wayman;
David Weberg; Jeanne Weberg;
Forrest Wheeler; and Jane Wheeler,
*Plaintiffs-Respondents,*

*v.*

ELKSIDE DEVELOPMENT LLC,
Successor in Interest to
Osprey Point RV Park, LLC et al.,
*Defendants,*

*and*

BARNETT RESORTS, LLC,
an Oregon Limited Liability Company,
dba Osprey Point RV Resort,
*Defendant-Appellant.*

Coos County Circuit Court
19CV14756; A174291

523 P3d 142

Plaintiffs, many of whom are aged 65 years or older, entered into membership camping contracts with a campground operator between 1999 and 2017. After the original campground operator sold the campground to defendant, defendant notified plaintiffs that it would not honor the contracts with the prior owner. Plaintiffs sued for breach of contract and elder financial abuse. The jury found for plaintiffs on both claims. On appeal of the resulting judgment, defendant argues that, as to each claim, the trial court erred in denying a directed verdict, because the evidence was legally insufficient to support a verdict in plaintiffs' favor. *Held*: The trial court did not err in denying a directed verdict on the breach of contract claim, on this record and given the arguments made. However, the court erred in denying a directed verdict on the elder abuse claim, as the evidence was legally insufficient to establish either of the pleaded theories of elder abuse.

Judgment on elder financial abuse claim reversed and remanded; otherwise affirmed.

Andrew E. Combs, Judge.

Alicia M. Wilson argued the cause for appellant. Also on the briefs was Frohnmayer, Deatherage, Jam Ieson, Moore, Armosino & McGovern, P.C.

Dan G. McKinney argued the cause for respondents. Also on the brief was DC Law.

Before Tookey, Presiding Judge, and Aoyagi, Judge, and Armstrong, Senior Judge.

AOYAGI, J.

Judgment on elder financial abuse claim reversed and remanded; otherwise affirmed.

## AOYAGI, J.

This case involves a dispute over membership camping contracts. For nearly 20 years, Elkside Development, LLC (Elkside) owned and operated the Osprey Point RV Resort in Lakeside. Elkside sold memberships as part of its business model. In exchange for payment of an initial fee and annual dues, members received free use of the campground for a significant portion of the year and other benefits. In April 2017, Elkside sold the property to defendant Barnett Resorts, LLC. Two months later, defendant gave notice to all members—including plaintiffs—that it would not honor Elkside's membership contracts. That led to the filing of this action. Plaintiffs are 71 people who, collectively, were party to 39 membership contracts with Elkside. Fifty-six of the plaintiffs are aged 65 years or older. As relevant here, a jury found that, in failing to honor the contracts, defendant committed breach of contract, for which the jury awarded $500,000 in damages, and elder financial abuse under ORS 124.100, for which the jury awarded $900,000 in damages, which was automatically trebled to $2.7 million.

Defendant appeals the resulting judgment, raising four assignments of error. First, defendant challenges the denial of its motion for summary judgment on the breach of contract claim. We conclude that that ruling is unreviewable. Second, defendant challenges the denial of its motion for a directed verdict on the breach of contract claim. We reject that claim of error and, accordingly, affirm the judgment as to the breach of contract claim. Third, defendant challenges the denial of its motion for a directed verdict on the elder financial abuse claim. We agree that the trial court erred in that regard and, accordingly, reverse and remand for dismissal of the elder financial abuse claim. Fourth, defendant challenges the denial of its motion for a directed verdict on a claim for intentional interference with economic relations (IIER), which was pleaded in the alternative to the claim for breach of contract. Our resolution of the second assignment of error obviates the need to address the fourth assignment of error.

## I.   FACTS

In reviewing the denial of a motion for a directed verdict, we consider the evidence and all reasonable inferences

from that evidence in the light most favorable to the non-moving party, which in this case was plaintiffs. *York v. Bailey*, 159 Or App 341, 349, 976 P2d 1181, *rev den*, 329 Or 287 (1999). We state the facts accordingly.

From 1999 until April 2017, Elkside operated the Osprey Point RV Resort on real property that it owned in Lakeside.[1] As part of its business model, Elkside sold camping memberships, which were effectuated through membership contracts. People paid an initial fee to purchase a membership (such as $5,900) and annual dues to maintain the membership (such as $325 per year). As members, they were entitled to use the campground for free for a significant portion of the year (such as 265 days), including free utilities, and at a reduced rate for the rest of the year. They also received other on-site benefits at a reduced cost. The contracts generally provided for "lifetime" memberships and transfer rights.

Plaintiffs purchased their memberships between 1999 and 2016, entering into a total of 39 membership contracts with Elkside. Those 39 contracts vary in their details but are generally as described above. The contracts do not address what will happen in the event that the property is sold.[2]

Around 2005, Elkside began trying to sell the property, and it was on the market for most of the next 12 years. From the beginning, it was important to Mike Smalley—one of the members of Elkside—to try to sell the property to someone who would honor the existing campground memberships, and several possible buyers dropped out over the years because of the membership contracts. The property was initially listed at $5.9 million. Elkside later reduced the price to $3.3 million, then to $2.65 million in 2012, then to $1.995 million in 2013.

---

[1] Elkside is the successor of Osprey Point RV Park, LLC. Each entity had as its members Mike Smalley and one or more of his family members. Like the parties, we do not distinguish between the two entities. We use "Elkside" to refer to both entities. References to "Smalley" are to Mike Smalley.

[2] In 2001, Elkside gave a document to then-members to "certify" and "guarantee" resort privileges, including stating, "If Osprey Point RV Resort should be sold the above membership will continue in force under the direction of the new manager." It is unclear how many of plaintiffs were members in 2001.

On April 28, 2017, defendant—an LLC whose members are Chris and Stefani Barnett—purchased the real property from Elkside, along with certain personal property and the business name, for $1.995 million. The closing documents did not list the membership contracts as an encumbrance or otherwise mention them. The executed bill of sale provided that the property was "free and clear of and from all encumbrances, security interests, liens, mortgages and claims whatsoever." Defendant was aware of the membership contracts, however, when it purchased the property. Before closing, defendant had requested a list of active memberships, reviewed copies of some or all of the membership contracts, and begun talking to people about whether the contracts would be binding on defendant if it purchased the property. Defendant also was aware that Smalley wanted the contracts to be honored after the sale; for example, in an email to Chris Barnett on February 26, 2017, attaching the "requested info on members," Smalley had stated, "I believe that honoring the remaining contracts is worth the effort. It is an income and will not create negative reviews around the industry."

There is conflicting evidence as to whether, at the time of closing, defendant intended to honor Elkside's membership contracts. In any event, there is no evidence that defendant ever promised or otherwise represented to Elkside that it would honor the contracts.[3]

On May 14, 2017, defendant sent a letter to people who had "purchased a Membership prior to the new ownership." The letter explained that defendant was not accepting any new memberships and announced "some immediate changes that will be in effect" relating to memberships. In describing those changes, the letter at least implied that defendant intended to honor the existing membership contracts, albeit perhaps on their narrowest terms, while

---

[3] There is evidence that Elkside wanted the membership contracts honored, may have even believed that a new owner would find it legally difficult to avoid them, and had that in mind when pricing the property (initially at $5.9 million, then at $3.3 million, then at $1.995 million). However, plaintiffs do not contend that defendant made any actual promises to Elkside, and, on this record, it would require improper speculation and stacking of inferences to find that defendant actually promised or otherwise represented to Elkside that it would honor the contracts.

disavowing any "verbal or handshake agreements" with the previous owner.[4] Only 10 days later, however, on May 24, defendant sent an email to its staff that instructed them not to accept any new reservations from people who bought memberships from the previous owner, explaining that an attorney was reviewing the contracts and that it would be "too confusing for the resort to conduct business as usual" while that happened. The email went on to state that, if anyone with a membership asked what to do, "please kindly tell them they cannot stay for Free and must pay regular resort prices." The email then reiterated that all future reservations should be booked at the current season rates, that "[a]nyone can still stay at the resort but only under regular rates," and that "there are no special fees or free stays until further notice."

On June 20, 2017, defendant sent a letter to everyone with a membership contract. The upshot of the letter was that defendant would not be honoring the contracts. Defendant explained that it was the new owner, that it had purchased the resort but not the contracts, that defendant had "started fresh as a regular RV Park with nightly stays," and that defendant did not consider it financially feasible to honor memberships that were purchased from the previous owner. Plaintiffs identify June 20, 2017, as the date on which the contracts were breached.

In April 2019, two years after defendant purchased the property, plaintiffs filed this action, asserting claims against Elkside, defendant, Chris Barnett, and Stefani Barnett. Plaintiffs obtained a default judgment against Elkside, which was not appealed and is not at issue. Plaintiffs' claims against the Barnetts individually were dismissed on summary judgment and are the subject of a separate appeal. *See Adelsperger v. Elkside Development LLC*, 317 Or App 666, 504 P3d 1, *rev allowed*, 370 Or 56 (2022). As for plaintiffs' claims against defendant, three claims went to the jury and are the subject of this appeal: breach of contract, elder financial abuse under ORS 124.100, and IIER.

---

[4] Chris Barnett felt that membership holders were "trying to take advantage of" him by constantly requesting "freebies"—such as free fishing lessons, free boat rides, free massages, free use of the event center, free pinball machines, etc.—based on alleged handshake deals and verbal agreements with Smalley.

The parties stipulated to certain facts, including that none of the plaintiffs had entered into a contract with defendant, that defendant had not received membership dues from any of the plaintiffs, and that all of the plaintiffs were "monetarily damaged" by their contracts not being honored "to the extent that membership dues were less than the fair market value of the services received."

At the close of plaintiffs' case-in-chief, defendant moved for directed verdicts on all three claims. The trial court denied the motion.

Ultimately, the jury found for plaintiffs on all three claims submitted to it. On breach of contract, the jury found that plaintiffs' membership contracts were binding on defendant, presumably as covenants running with the land given how the jury was instructed; that defendant had breached those contracts; and that such breach had resulted in $500,000 in damages. On elder financial abuse under ORS 124.100, the jury found for the elderly plaintiffs and awarded $900,000 in damages, which the court trebled to $2.7 million as a matter of law. *See* ORS 124.100(2)(a) (requiring the court to award "three times all economic damages" to a prevailing plaintiff); ORS 124.100(2)(b) (requiring the court to award "three times all noneconomic damages" to a prevailing plaintiff). The court entered a general judgment and money award for plaintiffs on the breach of contract and elder financial abuse claims. The jury also found for plaintiffs on the IIER claim, but that claim was pleaded in the alternative to the breach of contract claim—applying only if it was determined that defendant was not bound by Elkside's contracts—so no judgment was entered on the IIER claim. Plaintiffs' other claims against defendant—for declaratory relief, appointment of a trustee, and specific performance—also were not reduced to judgment, for various reasons, and are not at issue on appeal.

## II.   BREACH OF CONTRACT CLAIM

Defendant's first two assignments of error pertain to the breach of contract claim. Defendant argues that the trial court erred, first, by denying defendant's motion for

summary judgment and, second, by denying defendant's motion for a directed verdict.

We do not address the first assignment of error. "[A]n order denying summary judgment is not reviewable following a full trial on the merits, unless the motion rests on 'purely legal contentions' that do not require the establishment of any predicate facts." *York*, 159 Or App at 345. "[T]he denial of a motion for summary judgment that is based on facts, even undisputed facts, is not reviewable." *Staten v. Steel*, 222 Or App 17, 26, 191 P3d 778 (2008), *rev den*, 345 Or 618 (2009); *see also Farnsworth v. Meadowland Ranches, Inc.*, 321 Or App 814, 819-20, 519 P3d 153 (2022) (emphasizing the difference between the summary judgment standard and reviewability). Because defendant's summary judgment motion "turned on the significance of adjudicative facts (albeit, facts that defendant asserted to be undisputed)," *York*, 159 Or App at 346, the trial court's ruling denying that motion is unreviewable on appeal.

As for the second assignment of error, considering the particular arguments made to the trial court and on appeal, we conclude that the trial court did not err in denying defendant's motion for a directed verdict.

In their complaint, plaintiffs alleged that, when defendant purchased the campground from Elkside in April 2017, defendant, as "successor" to Elkside, "became obligated to honor the membership camping contracts," while Elkside's own obligations to honor the contracts also remained in force. With respect to the breach of contract claim, plaintiffs alleged that Elkside, as the original contracting party, had breached the contracts either "by assigning its obligations" to defendant without plaintiffs' permission or "by divesting itself of the resort such that it can no longer perform" its contractual obligations. Plaintiffs alleged that defendant, "if found to be successor in interest to [Elkside], was also obligated to honor the membership camping contracts and by refusing to do so breached the membership camping contracts between Plaintiffs and [Elkside]."

It is fair to say that the complaint is unclear as to what legal theory or theories plaintiffs were relying on

to assert that defendant was liable on Elkside's contracts. "[M]erely to say that a party has succeeded to a predecessor's interest in land does not say enough to explain why the successor should somehow be bound by a predecessor's agreement." *Sander v. Nicholson*, 306 Or App 167, 185, 473 P3d 1113, *rev den*, 367 Or 290 (2020). The only theory that the complaint actually mentions is assignment—a theory that was abandoned, in that no evidence of assignment was offered at summary judgment or trial. Additional theories were raised, however, during the pretrial summary judgment proceedings. Without getting into unnecessary detail, the record suggests that, by the time trial began, there were two theories on the table as to how defendant could be liable on Elkside's contracts, despite not having assumed them voluntarily. In defendant's view, it would be liable on the contracts only if plaintiffs proved that Elkside's mortgage holder had executed, delivered, and recorded a nondisturbance agreement in accordance with the statutory procedure for "membership camping contracts" provided in ORS 94.986(1). That, in defendant's view, "would prioritize plaintiffs' interests above blanket encumbrances then existing and provide for the mechanism to allow the contracts to run with the land and be enforceable on a subsequent purchaser." In plaintiffs' and the trial court's view, defendant also could be liable on the contracts if the common-law requirements for an equitable servitude or covenant running with the land were met.

When the trial court denied defendant's directed verdict motion, it made clear that it viewed the evidence as sufficient to allow a finding that the contracts ran with the land as a matter of common law. Specifically, when defendant argued that Elkside's noncompliance with ORS 94.986 meant that the contracts did not bind defendant, the court asked why "this can't be something other than a membership camping contract under ORS [chapter] 94" and why there was not a "common law issue here." Defendant responded that "that's not what Plaintiffs pled," that plaintiffs' use of the term "membership camping contracts" in their complaint necessarily invoked ORS chapter 94, and that "any sort of equitable servitude" was "simply not what they pled."

The trial court was unpersuaded. It considered the evidence sufficient to go to the jury on a common law theory.[5] As for defendant's pleading argument, the court explained that when there is evidence to support a theory not originally pleaded, "the pleadings can conform to the evidence." Because of how the issue developed below, the exact amendments made to the complaint to conform to the evidence are unclear, so we necessarily can only assume that they were consistent with how the court ultimately submitted the case to the jury.[6]

On appeal, as in the trial court, defendant emphasizes that the complaint did not mention equitable servitudes (or covenants running with the land). That is certainly true. However, the trial court viewed the evidence as sufficient to support such a theory and treated the complaint as having been implicitly amended to conform to the evidence. *See* ORCP 23 B (providing for amendment of the pleadings to conform to the trial evidence, including implicit amendment). To the extent that defendant indirectly suggests on appeal that the court should not have allowed implicit amendment of the complaint to conform to the evidence, that issue is unpreserved for appeal, as defendant never argued to the trial court that implicit amendment was

---

[5] The court referred to the "common law" generally, and it ultimately instructed the jury on covenants running with the land. *Compare Johnson v. Highway Division*, 27 Or App 581, 584, 556 P2d 724 (1976), *rev den*, 277 Or 99 (1977) ("Before a covenant may be said to run with the land and be binding upon a promisor's successors in interest, four requirements must be met: (1) there must be privity of the estate between the promisor and his successors; (2) the promisor and promisee must intend that the covenant run; (3) the covenant must touch and concern the land of the promisor; and (4) the promisee must benefit in the use of some land possessed by him as a result of the performance of the promise.") *with Ebbe v. Senior Estates Golf*, 61 Or App 398, 405, 657 P2d 696 (1983) (A "promise is binding as an equitable servitude if (1) the parties intend the promise to be binding; (2) the promise concerns the land or its use in a direct and not a collateral way; and (3) the subsequent grantee has notice of the covenant, either actual or constructive." (Internal quotation marks omitted.)).

[6] By contrast, in *Sander*, 306 Or App at 185-86, it was error to direct a verdict in the plaintiffs' favor on a breach of contract claim, based on breach of an easement agreement, given how the claim was pleaded. And, in *LDS Development, LLC v. City of Eugene*, 280 Or App 611, 614, 618 n 8, 622, 382 P3d 576 (2016), *rev den*, 361 Or 100 (2017), the trial court erred by granting summary judgment on an unpleaded theory. Here, the way the issue evolved makes it difficult to discern the court's exact thinking—and also precludes our saying that the court erred.

improper in these circumstances. Defendant argued only that the existing pleadings did not raise the matter. The issue also is not properly before us on appeal, because defendant has assigned error only to the ruling on the motion for a directed verdict. It has not assigned error to the denial of any objection to allowing implicit amendment, to admitting the underlying evidence, or the like. Indeed, as in the trial court, defendant has not even acknowledged the principle of implied amendment to conform to the evidence, let alone developed an argument as to how or why it was improper to recognize an implied amendment in these circumstances.

It therefore would be improper for us to consider, as a basis for potential reversal of the judgment, the propriety of the trial court treating plaintiffs' complaint as having been amended to conform to the evidence. Accordingly, we proceed with the understanding that the complaint was implicitly amended to assert an equitable servitude or a covenant running with the land, as the basis by which the membership contracts (or at least some parts of them) became binding on defendant when it purchased the land. With that understanding, we cannot conclude that the trial court erred in denying a directed verdict on the breach of contract claim. In moving for a directed verdict, defendant did not make any substantive argument to the trial court as to why the evidence was insufficient to prove an equitable servitude (or a covenant running with the land), asserting only that it was "not what [plaintiffs] pled." On appeal, defendant has similarly focused on the alleged pleading defect, rather than the evidence. The only time that it addresses the *evidence* is in its reply brief. For example, as to whether the membership contracts directly touch and concern the land, in its reply brief, defendant points for the first time to a provision in the contracts that would have allowed Elkside to transfer the memberships to "a substitute property in the same general area" that was as or more desirable for camping and outdoor recreation. Those belated arguments raise interesting issues, but they were not raised in the trial court in arguing the directed verdict motion, or in the opening brief on appeal. *See Clinical Research Institute v. Kemper Ins. Co.*, 191 Or App 595, 609, 84 P3d 147 (2004) (regarding new theories raised in a reply brief).

In sum, on this record and given the arguments that were made, we reject the second assignment of error, challenging the court's denial of a directed verdict on the breach of contract claim. Our conclusion as to the common law theory obviates the need to address defendant's arguments under ORS 94.986, the statute regarding membership camping contracts. Our disposition of the second assignment of error also obviates the need to address the fourth assignment of error, as previously mentioned, because the IIER claim was pleaded in the alternative to the breach of contract claim.

### III.   ELDER FINANCIAL ABUSE CLAIM

Defendant's third assignment of error pertains to the claim for elder financial abuse asserted by the 56 plaintiffs who are aged 65 years or older. ORS 124.100(4) provides for an action "for financial abuse described in ORS 124.110." ORS 124.110(1) in turn provides that "[a]n action may be brought under ORS 124.100 for financial abuse" in either of two circumstances:

"(a)   When a person wrongfully takes or appropriates money or property of a vulnerable person, without regard to whether the person taking or appropriating the money or property has a fiduciary relationship with the vulnerable person.

"(b)   When a vulnerable person requests that another person transfer to the vulnerable person any money or property that the other person holds or controls and that belongs to or is held in express trust, constructive trust or resulting trust for the vulnerable person, and the other person, without good cause, either continues to hold the money or property or fails to take reasonable steps to make the money or property readily available to the vulnerable person when:

"(A)   The ownership or control of the money or property was acquired in whole or in part by the other person or someone acting in concert with the other person from the vulnerable person; and

"(B)   The other person acts in bad faith, or knew or should have known of the right of the vulnerable person to have the money or property transferred as requested or otherwise made available to the vulnerable person."

A "vulnerable person" includes any person aged 65 years or older. ORS 124.100(1)(e) ("vulnerable person" includes an "elderly person"); ORS 124.100(1)(a) ("elderly person" means a person 65 years of age or older).

In their complaint, the subset of plaintiffs aged 65 years or older alleged that defendant had acquired ownership of the resort and taken over the responsibility to honor the membership camping contracts and, thereby, "acquired a property right of the Elderly Plaintiffs (ORS 124.110(a)) or hold in trust the annual dues and property rights of the Elderly Plaintiffs (ORS 124.110(b))." They further alleged that defendant had "acted in bad faith in refusing to honor the property rights"; that defendant "[knew] or should have known that the Elderly Plaintiffs had the rights in the membership camping contracts and the rights to use the Resort"; and that defendant had committed elder financial abuse "by denying the elderly Plaintiffs access to the Resort, by breaching the membership camping contracts and the additional benefits purchased by Elderly Plaintiffs, and by denying the property rights of the Elderly Plaintiffs."

At the close of plaintiffs' case-in-chief, defendant moved for a directed verdict on the elder financial abuse claim, citing *Bates v. Bankers Life and Casualty Co.*, 362 Or 337, 408 P3d 1081 (2018), for the proposition that a contract dispute does not give rise to liability for elder financial abuse.

In ruling on the motion, the court described the legal standard and summarized plaintiffs' evidence. The court stated that it "didn't really see" any evidence of wrongful conduct, noting that "it's not against Oregon law for a business person to decide that they want to cancel a contract with a vulnerable person." The court also voiced concern that "[i]f you start making that the law, no person would want to *** have contracts with people who are over the age of 65, because every time they get into a squabble with them, they're going to get sued for treble damages." Ultimately, however, the court concluded that there was enough to go to the jury, on the theory that defendant deprived plaintiffs of their property insofar as plaintiffs had common law rights

running with the land, arising from their membership contracts, and were being excluded from the campground.

Defendant assigns error to that ruling, arguing that the evidence was legally insufficient to support a verdict under either ORS 124.110(1)(a) or ORS 124.110(1)(b).

A.   *ORS 124.110(1)(b)*

We begin with ORS 124.110(1)(b), which applies when a "vulnerable person entrusts his or her money or property to the other person and later requests its return, but the other person in bad faith refuses to return it." *Bates*, 362 Or at 344. In *Bates*, the Supreme Court answered a question certified to it by the United States Court of Appeals for the Ninth Circuit, in connection with an insurance dispute: "'Does a plaintiff state a claim under [ORS] 124.110 (1)(b) for wrongful withholding of money or property where it is alleged that an insurance company has in bad faith delayed the processing of claims and refused to pay benefits owed under an insurance contract?'" *Id.* at 339 (quoting *Bates v. Bankers Life & Cas. Co.*, 849 F3d 846, 847 (9th Cir 2017)).

The elderly plaintiffs in *Bates* contended that their payment of insurance premiums to the defendant insurance company constituted a transfer of money or property and that, when the defendant failed to pay policy benefits in bad faith, it was not only a breach of the insurance contract but also a refusal to return their money or property and thus elder financial abuse under ORS 124.110(1)(b). *Id.* at 341-42. The plaintiffs "essentially s[ought] to bring themselves within the words of the elder financial abuse statute by arguing that the insurance benefits that Bankers was contractually obligated to pay them constituted 'money or property' that 'belong[ed] to' them." *Id.* at 341 (quoting ORS 124.110(1)(b) (second brackets in original)).

The Supreme Court rejected that argument and answered "no" to the certified question. *Id.* at 340. The court explained that a claim for elder financial abuse under ORS 124.110(1)(b) has four elements. "The first element in time (although it appears in the middle of the provision) is that '[t]he ownership or control of the money or property

was acquired in whole or in part by the other person ***
from the vulnerable person.'" *Id.* at 344 (quoting ORS
124.110(1)(b)(A) (ellipses and brackets in *Bates*)).[7] There need
not be any wrongful conduct in the initial acquisition of the
money or property. *Id.* The second element is "the vulnerable
person's request to the other person that the other person
'transfer' to the vulnerable person any money or property
that 'belongs to' the vulnerable person." *Id.* (quoting ORS
124.110(1)(b)). The third element is "that the other person
'without good cause' continue to hold the money or property
that 'belongs to' the vulnerable person." *Id.* (quoting ORS
124.110(1)(b)). The fourth element is "that the other per-
son have acted 'in bad faith, or knew or should have known
of the right of the vulnerable person to have the money
or property transferred as requested.'" *Id.* (quoting ORS
124.110(1)(b)(B)).

The elderly plaintiffs' position in *Bates* that the
defendant violated ORS 124.110(1)(b) by failing to honor the
insurance contracts ran "into an initial, and fatal, textual
barrier." *Id.* at 344. It "essentially read[ ] out of the statute
the first element of the claim—that [the defendant] have
acquired 'ownership or control of the money or property from
[plaintiffs].'" *Id.* at 344-45 (final brackets in original). The
court disagreed with the plaintiffs that "their contractual
right to receive insurance benefits under the policies" was
money or property that the defendant acquired from them.
*Id.* at 345. Rather, the court explained, the "plaintiffs paid
insurance premiums to Bankers in exchange for insurance
policies." *Id.* The plaintiffs were "not seeking the return of
the money they transferred to Bankers in the form of pre-
mium payments, but instead the contractual benefits they
are entitled to under Bankers' insurance policies, which are
not the same thing." *Id.*

Although a contractual right to receive benefits
"might be considered 'property' in the broadest sense of the
word," the first element of ORS 124.110(1)(b) was not met,

---

[7] In the interests of completeness, we note that ORS 124.110(1)(b)(A) also
applies when ownership or control of the money or property is acquired by "some-
one acting in concert with the other person." That aspect of the statute was not at
issue in *Bates*, but it is another way to satisfy the first element.

because "the money or property" that the plaintiffs had given to the defendant—insurance premiums—was not the same "money or property" that they had requested from defendant—the benefits to which they were entitled under their contracts. *Id.* at 347. Even if it was "wrongful" for the defendant to fail to pay benefits under the contract terms, it was not a violation of ORS 124.110(1)(b). *Id.* In reaching that conclusion, the court acknowledged that its construction of the statute limits liability under ORS 124.110(1)(b) to "trust-like situations—and not simply to any failure to pay a contractual or other debt owed to a vulnerable person as a result of an arms-length consumer transaction." *Id.* at 346-47. That construction was dictated by the unambiguous text and context of the statute. *Id.* at 347.

Applying *Bates*, we reach the same conclusion here, *i.e.*, that the first element for liability under ORS 124.110 (1)(b) was not proved. Plaintiffs argue that their rights under the camping contracts were "money or property" that they "requested" that defendant "transfer" to them. That is directly analogous to the plaintiffs' position in *Bates* and fails for the same reasons. Plaintiffs did not seek return of the fees and dues that they paid to Elkside, so, even if defendant stands in Elkside's shoes, what plaintiffs requested from defendant—access to the resort and other benefits provided in their membership camping contracts—is "not the same thing" as what they transferred. *Id.* at 345. In short, plaintiffs are not asking for the return of money or property that they transferred in a trust-like situation; rather, they are seeking the benefit of a contractual bargain that they made. As in *Bates*, even if defendant breached the contract, and even if it was "wrongful" to do so, no claim exists under ORS 124.110(1)(b).

## B.   *ORS 124.110(1)(a)*

We next consider ORS 124.110(1)(a), which applies "[w]hen a person wrongfully takes or appropriates money or property of a vulnerable person." As used in ORS 124.110 (1)(a), "wrongful" refers to conduct that "is carried out in pursuit of an improper motive or by improper means." *Church v. Woods*, 190 Or App 112, 118-19, 77 P3d 1150 (2003) (concluding that the legislature intended "wrongful" in ORS

124.110(1)(a) to have that term's "well-understood meaning in the law of torts with regard to interference with legal interests").

To be considered improper, a party's means "must be independently wrongful by reason of statutory or common law, beyond the mere fact of the injury complained of." *Church*, 190 Or App at 119; *see also Ride PDX v. Tee & B, LLC*, 322 Or App 165, 168, 519 P3d 870 (2022) ("If liability is based on the use of improper means, then the means must violate some objective, identifiable standard, such as a statute or other regulation, or a recognized rule of common law, or, perhaps, an established standard of a trade or profession." (Internal quotation marks omitted.)). "Improper means, for example, include violence, threats, intimidation, deceit, misrepresentation, bribery, unfounded litigation, defamation and disparaging falsehood." *Church*, 190 Or App at 119 (internal quotation marks omitted); *see also Bates*, 362 Or at 344 (referring to "fraud, conversion, or theft" as wrongful means of acquiring a vulnerable person's money or property); *Allen v. Hall*, 328 Or 276, 286, 974 P2d 199 (1999) (making fraudulent misrepresentations to an elderly person's attorney and care providers to prevent execution of a new will would qualify as using improper means to interfere with a prospective inheritance).

In the trial court, plaintiffs did not identify any "improper means" that they were claiming defendant used to take or appropriate plaintiffs' property. On appeal, plaintiffs' only argument as to improper means is "conversion"—that defendant converted plaintiffs' "lifetime right to occupy specific portions of the resort property" to defendant's own use. That theory is untenable, because conversion relates only to chattels. *See Hemstreet v. Spears*, 282 Or 439, 444, 579 P2d 229, *appeal dismissed*, 439 US 948 (1978) ("[C]onversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel."); *Black's Law Dictionary* 268 (9th ed 2009) (defining "chattel" as "[m]ovable or transferable property; personal property; esp. a physical object capable of manual delivery and not the subject matter

of real property"); *see also Rapacki v. Chase Home Fin. LLC*, 797 F Supp 2d 1085, 1092 (D Or 2011) (citing *Hemstreet* and *Black's Law Dictionary* and concluding that real property subject to a trust deed was not a chattel and, accordingly, plaintiff's claim could not be "construed as a claim for conversion").

As for improper motive, we have never addressed improper motive in the specific context of ORS 124.110, but, under *Church*, we understand it to have its usual "well-understood meaning" in tort law. *Church*, 190 Or App at 118. Therefore, to be liable for elder financial abuse based on acts committed with an improper motive, the defendant's "purpose must be to inflict injury on the plaintiff 'as such.'" *Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or 487, 498, 982 P2d 1117 (1999) (quoting *Top Service Body Shop v. Allstate Ins. Co.*, 283 Or 201, 211, 582 P2d 1365 (1978)); *see also Ride PDX*, 322 Or App at 174 n 5 ("[T]o be actionable under the 'improper purpose' prong, the purpose must be to inflict injury *on the plaintiff*." (Emphasis in original.)).

For example, a defendant acting "with the sole design of injuring [the plaintiff] and destroying his business" would have an improper motive. *Top Service Body Shop*, 283 Or at 201-11. Conversely, a defendant acting in "pursuit of its own business purposes as it saw them" would not have an improper motive. *Id.* at 212; *see also Eusterman v. Northwest Permanente, P.C.*, 204 Or App 224, 238, 129 P3d 213, *rev den*, 341 Or 579 (2006) (a defendant's desire to maximize profits is not an improper motive). In *Ride PDX*, 322 Or App at 174 n 5, for example, we concluded that, even if the plaintiffs proved that the defendants' motive for complaining to their mutual landlord about noise from the plaintiffs' business was to obtain rent concessions for the defendants' own benefit, that would not prove an improper purpose.

Here, defendant notified plaintiffs on June 20, 2017, that it would no longer honor the membership contracts. Even assuming arguendo that not honoring the contracts would qualify as a taking or appropriation of plaintiffs' money or property—an issue that we need not decide— plaintiffs have not pointed to any evidence in support of their assertion that defendant had an "improper purpose"

in deciding not to honor the contracts, *i.e.*, that defendant's intent was specifically to injure plaintiffs *as such*. As the trial court noted in discussing the directed verdict motion, the evidence was that defendant decided not to honor the contracts based on Chris Barnett's conclusion that they were not valid or binding on defendant. Defendant acting in its own business interests, based on its own understanding of its legal obligations, is not an improper motive for refusing to honor contracts. It put defendant at risk of a breach of contract claim if plaintiffs took a different view, but it is not a viable basis for an elder financial abuse claim under ORS 124.110(1)(a).

In sum, on this record, plaintiffs failed to prove elder financial abuse under ORS 124.110(1). It follows that the trial court erred when it denied defendant's motion for a directed verdict on that claim.

Judgment on elder financial abuse claim reversed and remanded; otherwise affirmed.