No. 20 May 1, 2025 621

IN THE SUPREME COURT OF THE
STATE OF OREGON

Ron ADELSPERGER;
Sally Adelsperger;
Walter Arnold; Sandy Arnold;
Larry Brewer; Marilyn Brewer;
James Brown; Lonna Brown;
Bill Burgess; Jane Burgess; Shirley Calkins;
Jerry Christensen, aka Gerald Christenson;
Cindy Christensen, aka Cynthia Evans-Christenson;
Russell Cobb; Norma Cobb; Ron Ellis; Sallie Ellis;
Amy Flickenger Pierpoint, aka Amy Flickenger-Pierpoint;
Glen Pierpoint; Mike Fredrickson; Tresea Fredrickson;
David Fulcer; Sarah Fulcer;
Jack Gibson; Sharon Sue Gibson, aka Sue Gibson;
Mary Gray; Rudolph Hanna; Brenda Hanna;
Gerald Hastings, aka Jerry Hastings; Shirley House;
Michael Huntley; Gloria Huntley;
Rodney Hyde, aka Rod Hyde; Patricia Hyde;
Johnnie Issacs, aka Johnnie Isaacs;
Rowina Issacs, aka Rowena Isaacs;
Don Johnson, aka Donald Johnson; Linda Johnson;
Robert Kasmar; Linda Kasmar;
Kraig Knutson; Barbara Knutson;
Tom Kuntz; Brenda Kuntz;
Richard Mathis; Linda Mathis;
Gary McCord; Marie McCord; David McReynolds;
Joseph Moore; Geraldine Moore;
Adam Morgan; Vicky Morgan, aka Victoria Morgan;
Thomas Noel; William Oar;
Donald Partridge, aka Don Partridge;
Lucille Partridge, aka Lucy Partridge;
Craig Pedersen; Cheryl Pedersen;
David Smith; Carol Smith;
William Thomas, aka Bill Thomas; Jackie Thomas;
Fred Waidtlow; Linda Waidtlow;
Gary Wayman; Charlotte Wayman;
David Weberg; Jeanne Weberg;
Forrest Wheeler; and Jane Wheeler,
*Petitioners on Review,*

*v.*

ELKSIDE DEVELOPMENT LLC,
Successor in Interest to
Osprey Point RV Park, LLC et al.,
*Defendants,*
*and*

BARNETT RESORTS, LLC,
an Oregon Limited Liability Company,
dba Osprey Point RV Resort,
*Respondent on Review.*

(CC 19CV14756) (CA A174291) (SC S070210)

En Banc

On review from the Court of Appeals.*

Argued and submitted March 1, 2024.

Dan G. McKinney, and Ronald L. Sperry III, Douglas County Law, Roseburg, argued the cause and filed the briefs for petitioners on review.

Julie A. Smith, Cosgrave Vergeer Kester, LLP, Portland, argued the cause and filed the briefs for respondent on review.

Lindsey H. Hughes, Keating Jones Hughes, P.C., Portland, filed the brief for *amicus curiae* Oregon Association of Defense Counsel.

MASIH, J.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is affirmed.

Garrett, J., concurred in part and dissented in part and filed an opinion, in which Duncan and DeHoog, JJ., joined.

_____

* On appeal from Coos County Circuit Court, Andrew E. Combs, Judge. 322 Or App 809, 523 P3d 142 (2022).

**MASIH, J.**

Plaintiffs—most of whom were in their 70s or older at the time of the alleged breach—purchased "life-time" membership contracts in the Osprey Point RV Resort (the campground) located in Lakeside, Oregon. Defendant Elkside Development LLC (Elkside), owner and operator of the campground, advertised and sold it to defendant Barnett Resorts, LLC (defendant), at the below-market price of $1.995 million, with full disclosure of the existence and terms of plaintiffs' membership contracts and a desire that those contracts be honored. After purchasing the campground, defendant refused to honor the contracts even though it knew that some of the elderly plaintiffs relied on them for a place to live.[1] Plaintiffs brought an action against defendants for multiple claims, including breach of contract and elder abuse.[2] Following a four-day jury trial, the jury found defendant liable on both of those claims.[3] Defendant appealed, contending, among other things, that the trial court had erred in denying its motions for a directed verdict on both claims. The Court of Appeals affirmed on the breach of contract claim but reversed on the elder abuse claim and remanded for its dismissal. *Adelsperger v. Elkside Development LLC*, 322 Or App 809, 811, 523 P3d 142 (2022) (*Adelsperger II*). Both parties then requested review.

As we will explain, defendant presents no basis for reversing the trial court's denial of its motion for a directed verdict on the breach of contract claim. That is so because of how the claim was litigated in the trial court and Court of Appeals, and because the contentions that defendant raises

---

[1] Some of the plaintiffs lived full time at the campground and all plaintiffs were entitled to use it as their home for a significant part of a year.

[2] Technically, the "elder abuse" claim is a claim for abuse of vulnerable persons. *See* ORS 124.100 - 124.140 (providing for a civil cause of action for vulnerable persons subject to physical or financial abuse); *see also* ORS 124.100(1)(e) (defining "[v]ulnerable person" to include "[a]n elderly person"); ORS 124.100(1)(a) (defining "[e]lderly person" as "a person 65 years of age or older"). However, as have the parties, we use the term "elder abuse" for ease of reference.

[3] The trial court also entered a limited judgment of default against defendant Elkside in the amount of $500,000. That judgment is not at issue here. The trial court had additionally granted summary judgment to Chris and Stefani Barnett, defendant's member-managers, on the claims seeking to hold them personally liable. We previously considered whether that ruling was correct in *Adelsperger v. Elkside Development LLC*, 371 Or 61, 529 P3d 230 (2023) (*Adelsperger I*).

on review are unpreserved. Further, we conclude that the trial court correctly denied defendant's motion for a directed verdict on plaintiffs' elder abuse claim, and the Court of Appeals erred in concluding otherwise. Accordingly, we affirm in part and reverse in part the decision of the Court of Appeals, and affirm the judgment of the trial court.

## I.   THE FACTS

Because this case concerns the trial court's denial of defendant's motions for a directed verdict, "we consider (and describe) the evidence, and the reasonable inferences that may be drawn therefrom, in the light most favorable to plaintiffs—the parties opposing the motion[s]." *Knepper v. Brown*, 345 Or 320, 323, 195 P3d 383 (2008); *see also Woodbury v. CH2M Hill, Inc.*, 335 Or 154, 159, 61 P3d 918 (2003) ("Because the jury weighed the evidence, judged the credibility of the witnesses, and resolved all conflicts in the evidence, this court may rely on any fact that finds support in the record."). We state the facts accordingly.

Between 1999 and 2016, plaintiffs—a group of 71 individuals, the vast majority of whom were over 65 years of age at the time of the alleged breach—collectively purchased 39 "lifetime" membership camping contracts in the campground from Elkside. In exchange for an initial fee (typically $5,995 or greater) and the payment of annual dues (mostly $325), members were entitled to free use of the campground for a significant part of the year (approximately 36 weeks). Many members were entitled to additional benefits, which varied by individual contract, and included, among other things, use of the campground for reduced rates during the remainder of the year, the freezing of annual dues for life, reduced storage and moorage fees, and benefits for family members. Some members paid extra to use particular campground spots (*e.g.*, waterfront). At least some of the plaintiffs lived full time at the campground and several others stayed there for a significant part of a year. Generally, the contracts provided for "lifetime" memberships and permitted the "transfer" of rights to others.

Elkside owned and operated the campground. Elkside is the successor in interest to Osprey Point RV Park, LLC.

Throughout this opinion, we refer to both entities as "Elkside." Mike Smalley, who is now deceased, and members of his family, including his brother, Jim Smalley, were members of Elkside, who all agreed to pursue the creation and marketing of membership contracts for the RV Park. The resort's website noted:

> "We are embarking on an era of unprecedented numbers of people entering retirement. Most are planning to purchase an RV and travel in their retirement years. As this phenomenon occurs, there will be growing demand for space availability and decreasing ability of RV parks to accommodate Non-Member visitors. With an Osprey Point RV Resort membership you have year round access to the resort and the ability to add hundreds of RV resorts nationwide plus Canada and Mexico."

In 1999, Elkside received a certificate of registration signed by the Real Estate Commissioner of the State of Oregon. The certificate indicated that Elkside was a membership campground operator that had been "properly registered for the sale of membership camping contracts within the State of Oregon." *See* ORS 94.953 - 94.989 (providing for membership campgrounds and membership camping contracts).

Before receiving its certificate of registration, Elkside entered into a "nondisturbance agreement"[4] with AT&T Capital Corporation, which held a blanket encumbrance on the real property on which Elkside operated the campground. The agreement referred to purchasers of membership camping contracts as vendees and provided for the protection of the interests of the vendees in their camping contracts in the event of a foreclosure sale or conveyance in lieu of a foreclosure sale. The agreement provided further that its provisions would be deemed covenants running with the land. The agreement was not recorded with the county, but the existence of the

---

[4] ORS 94.986(1) provides that membership camping contracts shall not be sold unless

"[e]ach person holding an interest in a blanket encumbrance executes and delivers to the Real Estate Commissioner a nondisturbance agreement and records such agreement in the real estate records of the county in which the campground is located."

A "nondisturbance agreement" is "an instrument by which the holder of a blanket encumbrance agrees that the holder's rights in the campground shall be subordinate to the rights of any membership camping contract purchaser." *Id.*

nondisturbance agreement was made known to at least some of the purchasers of the membership camping contracts.[5]

In 2004, in preparation for refinancing, Elkside entered into a nondisturbance agreement with Umpqua Bank. That agreement likewise included provisions to protect the interests of the purchasers of membership camping contracts in the event of a foreclosure sale or conveyance in lieu of foreclosure and deemed its provisions to be covenants running with the land. It included a section stating that the "agreement shall be liberally construed in favor of all campground membership owners in a manner that will accomplish the preservation of the right of such campground membership owners * * *." (Capitalization omitted.) The agreement was submitted for approval to the Oregon Real Estate Agency but not recorded with the county.

In 2005, Elkside listed the property for sale. The initial list price was approximately $5.9 million. Over the years, the list price was reduced several times for various reasons, including concerns by prospective buyers about the existence of the membership contracts. According to Scott Krause, the broker who eventually coordinated the sale of the property to defendant, the existing memberships were disclosed to all potential buyers along with the fact that they "went with the park." Krause testified that the membership contracts were "[e]xtremely important" to Mike Smalley and that "Mike Smalley would not have sold the park if the memberships would have been molested [in] any way, period." The reduced list price reflected that they "had to find the right person at the right price," which gives rise to an inference that Mike Smalley was willing to accept the reduced price for the RV Park only from a purchaser who would honor the existing membership contracts. By 2013, the list price had been reduced to $1.995 million, and the property sale advertisement materials Krause prepared and provided to prospective purchasers disclosed the existence of the membership contracts.

_____

[5] As additional evidence of Mike Smalley's state of mind concerning the effect of an eventual sale, plaintiffs offered a 2001 document signed by Smalley, which included a statement that, if the resort "should be sold[,] the above membership will continue in force under the direction of the new manager." Several plaintiffs received that document.

In 2017, defendant's member-managers Chris and Stefani Barnett received those advertisement materials disclosing the membership contracts, and defendant offered to purchase the property for the full list price of $1.995 million. Before the sale was finalized, defendant was aware that the list price was significantly less than the property's appraised value of $2.8 million. The $2.8 million appraised value was based solely on the RV Park real property, personal property (furniture, fixtures and equipment), and surplus land value.

Although it does not appear that the appraiser was made aware of the membership contracts expressly, the appraiser visited the campground, and the website for the campground included information about the benefits of membership contracts for people entering retirement. Defendant was also aware of the terms of the membership contracts before the sale closed. It requested information about the memberships and asked to see "all Membership contracts to discuss with [its] attorney." Mike Smalley emailed Chris Barnett a copy of the membership contract for plaintiffs Walter and Sandy Arnold. The contract documents included a page signed by the Arnolds entitled "Receipt for Disclosure Statement," stating, in part, that, "[a]s required by the Oregon State Real Estate Commission, 'any person who sells a membership camping contract shall provide the prospective purchaser with those written disclosures as required under ORS 94.959.'" According to Jim Smalley, after receiving a copy of the Arnold contract, Chris Barnett came to the resort and reviewed all the contracts, which were kept in the campground office. He also recounted a conversation with Chris Barnett and Mike Smalley in which the Smalleys explained to Barnett that, although, in their past experience, some buyers had not wanted to purchase the park because it was a "membership park," the memberships were "not really a negative." The Smalleys told Chris Barnett that the memberships created "other revenue streams" because the members used the facilities on the property like the laundromat, arcade, pub, and general store.

Although plaintiffs did not contend that defendant affirmatively promised or otherwise represented to Elkside that it would honor the contracts, defendant knew that

Mike Smalley wanted the membership contracts to be honored and according to Jim Smalley, allowed the Smalleys to believe that it would honor the contracts. In an email to Chris Barnett, Mike Smalley noted that the "members are an elderly bunch" and stated, "I believe that honoring the remaining contracts is worth the effort. It is an income and will not create negative reviews around the industry." Chris and Stefani Barnett testified that defendant did not intend to honor the contracts, yet they did not express that intent in any written response to Mike Smalley's email. Jim Smalley testified that the Barnetts never said that they "didn't want any memberships involved, period. That never happened. It was never brought up." He testified further that Mike Smalley never came to him as an owner-member of Elkside to discuss any request by the Barnetts for cancellation of the contracts, and Elkside never took any vote or action to cancel the outstanding contracts. According to Jim Smalley, if the membership contracts did not exist, he believed that they could have sold the property for a considerably higher price.

In April 2017, the sale of the property closed with defendant purchasing the real property, some personal property, and the business name (Osprey Point RV Resort) from Elkside. The closing documents did not list the membership contracts as an encumbrance on the property. Krause testified that he had sold other campgrounds with membership contracts and that those sales documents also did not expressly call out the membership contracts but were disclosed to the purchaser in the same manner prior to the sale. And although defendant was aware of the membership contracts and had confirmed that other contracts, such as those with vendors for food, arcade equipment, water, cable, trash and other utilities had been canceled by Elkside, it did not take such affirmative steps to ensure that Elkside had also canceled the membership contracts.

To the contrary, in mid-May, defendant sought to *enforce* terms of the membership contract against two members, Mary Gray and Jerry Hastings, informing them that they had violated a term of the contract. Chris Barnett

attached a copy of the relevant page of the membership contract in the communication with Gray and Hastings.

Chris and Stefani Barnett also sent a letter to all the members acknowledging their memberships. Specifically, the letter stated, "We are the new owners of the Resort and understand you have purchased a Membership prior to the new ownership that we have today." The letter informed the members about some "immediate changes," including (1) an increase in membership dues for services that had yet to be determined; (2) the voiding of some previously made reservations, which had to be "remade based on availability"; (3) a requirement that reservations for members could "only be made with 2 weeks advance notice for [a] maximum 14 day stay"; and (4) a requirement that a member who chose to stay during "off weeks" would pay "the regular daily rate."

About two weeks later, Chris Barnett emailed the staff responsible for making reservations, instructing them not to accept reservations from those who had purchased memberships from Elkside. The email explained that defendant had not sold the memberships and that it had "not sign[ed] anything" accepting them. According to the email, an attorney was reviewing the contracts, and it was "too confusing for the resort to conduct business as usual." The email advised staff to tell members that "[a]nyone can still stay at the resort but only under regular rates" and that "there are no special fees or free stays until further notice."

Then, in late June, defendant sent a letter—which plaintiffs alleged constituted the breach of contract— informing the members that their contracts would not be "honored." The letter explained that the contracts had not been purchased from Elkside or "transferred" to defendant. The letter further explained that defendant had not purchased Elkside's business plan and company but had "started fresh as a regular RV Park with nightly stays" and would be returning any dues checks.

In January 2018, defendant exchanged emails with Michael Hanifin at the Oregon Real Estate Agency. In those emails, Barnett took the position that "we are not

a registered campground as others think we are or was." In his response, Hanifin advised Barnett:

> "Just to clarify, the previous owner of your property had registered to sell membership campground memberships using that location. I mention this because you said 'we are not a membership campground as others think we are or **was**.' So, I agree you have not registered a membership campground, but I can't agree that that land wasn't being used as a membership campground prior to your ownership (if that was your meaning)."

(Boldface in original.)

A few months later, in March 2018, defendant sent a letter to Elkside's "past" members. In addition to informing them that Mike Smalley had died, the letter indicated that their membership contracts were "not enforceable or valid." The letter explained that defendant had purchased real property and that, at the time of the sale, "there was no disclosure or recorded document(s) indicating the subject property was a membership campsite or that the property was subject to any interest or right to use the property by third parties." Relying on ORS 94.986(1)—a statutory provision concerning the sale of membership camping contracts—the letter further explained that, because the statutory requirements concerning membership camping contracts required the recording of nondisturbance agreements and no such agreements had been recorded, defendant had been advised that the contracts were not enforceable or valid, despite the representations that may have been made to the members by Elkside.

## II.  PROCEDURAL HISTORY

### A.  *Trial Court*

#### 1.  *Overview*

Plaintiffs eventually filed an action against Elkside, defendant, and defendant's member-managers—Chris and Stefani Barnett. Among other claims, plaintiffs alleged (1) a claim for breach of contract against Elkside, defendant, and Chris and Stefani Barnett individually; (2) an alternative claim for intentional interference with contractual relations against defendant and the Barnetts individually; and (3) a

claim for elder abuse against defendant and the Barnetts individually.

As noted above, the trial court entered a limited judgment of default against Elkside in the amount of $500,000. That judgment is not at issue here.

The trial court also granted summary judgment to Chris and Stefani Barnett on the claims seeking to hold them personally liable. We previously considered whether that ruling was correct in *Adelsperger v. Elkside Development LLC*, 371 Or 61, 529 P3d 230 (2023) (*Adelsperger I*).[6]

A trial was conducted on the remaining claims against defendant. Among other things, the parties stipulated that (1) all plaintiffs had memberships with Elkside; (2) no plaintiff had entered into a contract with defendant; and (3) defendant had not received any dues or contract fees from any plaintiff.

2.  *Defendant's motions for a directed verdict*

At the close of plaintiffs' case, defendant moved for a directed verdict, contending that it was entitled to judgment as a matter of law on both the breach of contract and elder abuse claims. To provide context for defendant's motions, we describe how each claim evolved during the course of the litigation.

a.  Breach of contract claim

With regard to the breach of contract claim, plaintiffs alleged that Elkside had "assign[ed] its obligations" to defendant and defendant had "thereafter denied the Plaintiffs' rights under the membership camping contracts." Plaintiffs further alleged that, if defendant was found to be Elkside's successor in interest, defendant was obligated to honor the contracts between plaintiffs and Elkside and, by refusing to do so, had breached them.

---

[6] In *Adelsperger I*, we held that the trial court had not erred in granting summary judgment to the member-managers—the Barnetts—on the breach of contract claim, 371 Or at 73, but erred in granting summary judgment on the elder abuse claim, *id.* at 71. We also affirmed by an equally divided court the trial court's grant of summary judgment to the member-managers on a claim for intentional interference with contract. *Id.* at 65. As a result, we remanded for further proceedings. *Id.* at 76.

However, by the time of trial, the parties' positions as to whether and how defendant was bound by the membership contracts had evolved. Plaintiffs' position was that defendant was bound by the membership camping contracts either because defendant had actual knowledge of them, or because a "full investigation" would have disclosed the nature of plaintiffs' contractual interests, or because the "ongoing obligation to maintain the RV park for the members" constituted an "equitable servitude."[7] Conversely, defendant's position was that it was not bound by the contracts because it was not a party to any of them, because it had purchased only the property and was not a successor in interest to Elkside, and because the requirements of the statutes governing membership campgrounds and membership camping contracts—specifically, the recording requirements—had not been satisfied. In addition, defendant asserted that any interests of plaintiffs were void as against it because it had conducted a reasonable investigation and was a bona fide purchaser.

In moving for a directed verdict on the contract claim, defendant's contentions were based on its understanding that membership camping contracts are creatures of statute. For that reason, defendant's primary contention was that, because the statutory requirements for membership camping contracts in ORS chapter 94—including the statutory recording requirements—had not been satisfied, it was not bound by them. Defendant also noted that, under those statutes, membership camping contracts are "interpreted as retail installment contracts that can be assigned, bought[,] and sold," but that there was no evidence that that had occurred. Finally, citing *LDS Development, LLC v. City of Eugene*, 280 Or App 611, 382 P3d 576 (2016), *rev den*, 361 Or 100 (2017) (*LDS*), defendant contended that it could not be liable for breach of contract. According to defendant,

---

[7] Plaintiffs relied on *Ebbe v. Senior Estates Golf*, 61 Or App 398, 657 P2d 696 (1983), for a description of the requirements of an "equitable servitude." *See id.* at 404-05 (citing *Hudspeth v. Eastern Oregon Land Co.*, 247 Or 372, 430 P2d 353 (1967), and *Fitzstephens v. Watson et al*, 218 Or 185, 344 P2d 221 (1959), as illustrations of the "general rule" that "even if all technical requirements for a covenant to run with the land are not met, the promise is binding as an equitable servitude if (1) the parties intend the promise to be binding; (2) the promise concerns the land or its use in a direct and not a collateral way; and (3) the subsequent grantee has notice of the covenant, either actual or constructive" (internal quotation marks and brackets omitted)).

there was no privity of contract, and it was not a successor in interest to Elkside. In other words, defendant was nothing other than the successor owner of the property itself.

When the trial court suggested that, regardless of the statutory requirements, the "pleadings [could] conform to the evidence" and that the contracts could be binding on defendant as a servitude under common-law principles, defendant responded that plaintiffs had pleaded a claim for the breach of membership camping contracts, which necessarily invoked the statutory requirements, protections, and benefits governing such contracts, and had not pleaded "any sort of equitable servitude" or requested "some common law benefit." The trial court denied defendant's motion, noting that "the pleadings can conform to the evidence" and viewing the evidence presented as sufficient to permit the jury to consider whether the contracts constituted servitudes that ran with the land under the common law.[8] Ultimately, the trial court instructed the jury consistently with that view, including an instruction on the elements of a covenant running with the land.

b.   Elder abuse claim

The claim for financial elder abuse was asserted by those plaintiffs who were 65 years of age or older. *See* ORS 124.100(4) (providing for an action "for financial abuse described in ORS 124.110"). As pertinent, ORS 124.110(1) provides that an action for financial abuse may be brought in the following circumstances:

"(a)   When a person wrongfully takes or appropriates money or property of a vulnerable person, without regard to whether the person taking or appropriating the money or property has a fiduciary relationship with the vulnerable person.

"(b)   When a vulnerable person requests that another person transfer to the vulnerable person any money or property that the other person holds or controls and that

_____

[8] In particular, the court noted that the "evidence that's been presented here so far" is that, "clearly, as far as *** [p]laintiffs are concerned here, they had an expectation that this would continue, because they're talking about lifetimes" and "there also is evidence where [Jim] Smalley is sitting here saying, yes, that they all thought this would run with the land and *** they were telling people that, and that's why they had to lower the price from 5.9 down to 1.9 [million dollars]."

belongs to or is held in express trust, constructive trust or resulting trust for the vulnerable person, and the other person, without good cause, either continues to hold the money or property or fails to take reasonable steps to make the money or property readily available to the vulnerable person when:

"(A)   The ownership or control of the money or property was acquired in whole or in part by the other person or someone acting in concert with the other person from the vulnerable person; and

"(B)   The other person acts in bad faith, or knew or should have known of the right of the vulnerable person to have the money or property transferred as requested or otherwise made available to the vulnerable person."

Plaintiffs' complaint alleged that, by "acquiring ownership of the Resort" and by "taking over the responsibility to honor the membership campground contracts," defendant had "acquired a property right" under ORS 124.110(1)(a) or was "hold[ing] in trust the annual dues and property rights" of the elderly plaintiffs under ORS 124.110(1)(b). Plaintiffs further alleged that defendant had "acted in bad faith in refusing to honor the property rights" when it knew or should have known that those plaintiffs "had the rights in the membership camping contracts and the rights to use the Resort." According to plaintiffs, defendant "engaged in financial abuse of an elderly person" by denying the elderly plaintiffs access to the resort, breaching the membership contracts and additional benefits purchased by the elderly plaintiffs, and denying the elderly plaintiffs' property rights.

In their trial briefing, plaintiffs argued that they had a "contractual right" to possess the property, and that defendant had "so persistently interfered" with that possessory right that it constituted a "taking of property." Specifically, plaintiffs argued, the property acquired by defendant was "subject to a trust or equitable servitude" in their favor, and that, "[b]y refusing to allow the Plaintiffs to use the property," defendant had acquired plaintiffs' property and had "so consistently and persistently interfered with" plaintiffs' property that it rose to "the level of conversion or wrongful acquisition and thus, constituted elder abuse under Oregon law."

In moving for a directed verdict, defendant relied on *Bates v. Bankers Life and Casualty Co.*, 362 Or 337, 408 P3d 1081 (2018), for the proposition that the statutes governing elder abuse do not contemplate liability for an arm's-length transaction or breach of contract. However, returning to common-law concepts, the trial court noted that, if the contracts constituted equitable servitudes that ran with the land, those would be property interests that could be subject to the elder abuse statutes.

Turning to the question of "whether or not what happened *** was wrongful," the court noted that "it's not against Oregon law for a business person to decide that they want to cancel a contract with a vulnerable person" and that, if that were the law, "no person would want to *** have contracts with people who are over the age of 65[.]" Noting its understanding that the "wrongful" standard for purposes of an elder abuse claim was the same standard that existed for intentional interference with contractual relations, the trial court indicated that the "worst case scenario" here was that defendant "knew about the contracts" and "said forget it, who cares." According to the trial court, that was a breach, which is within a business person's rights. Although the court stated that it "didn't really see" wrongful conduct, it nonetheless denied defendant's motion for a directed verdict, indicating that it did not "want to just take it away from the jury *** at this juncture."[9] The court suggested that defendant "make [its] motion again at the conclusion of [the] evidence," but defendant did not do so. Ultimately, the trial court instructed the jury that conduct is wrongful if it is "carried out in pursuit of an improper motive, by improper means or in bad faith" and that improper means are those that are "independently wrongful by reason of statutory or common law beyond the mere fact of the injury from plaintiff," including "violence, threats, intimidation, deceit, misrepresentation, bribery, unfounded litigation, defamation, undue influence, and disparaging falsehood." The instruction did not define "improper motive" further.

---

[9] At the directed verdict stage, plaintiffs' counsel argued that "the wrongful behavior" was the fact "that Mr. Barnett tricked the Smalleys into selling them the property for half price" and "never planned on enforcing the contracts[.]"

### 3. *The verdict*

The case was submitted to the jury, which returned verdicts in favor of plaintiffs.[10] Specifically, the jury found that "[p]laintiffs' membership camping contracts [were] binding on [defendant]" and awarded plaintiffs $500,000 in total damages for breach of contract. The jury also found defendant liable for elder abuse, awarding plaintiffs $900,000 in total damages. Based on that verdict, the trial court entered a judgment in favor of all plaintiffs for $500,000 and $2.7 million in favor of the vulnerable plaintiffs. *See* ORS 124.100(2)(a) and (b) (providing for treble damages to vulnerable plaintiffs who prevail in an action for financial abuse).

## B. *Appeal and Review*

Defendant appealed, assigning error to the trial court's denial of its directed verdict motions. As we will explain in more detail below, the Court of Appeals upheld the denial as to the breach of contract claim but reversed as to the elder abuse claim.

Plaintiffs then petitioned for review, raising issues concerning the Court of Appeals' reversal of the elder abuse claim. Defendant filed a contingent request for review, raising issues concerning that court's affirmance of the breach of contract claim. We allowed review of plaintiffs' petition and defendant's contingent request.

## III. ANALYSIS

We review the denial of defendant's directed verdict motions to determine whether defendant was entitled to judgment as a matter of law. *See Brown v. J.C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984) (explaining that, on review of the denial of a motion for directed verdict, we cannot set a verdict aside "unless we can affirmatively say that there is no evidence from which the jury could have

---

[10] In addition to returning verdicts in plaintiffs' favor on the breach of contract and elder abuse claims, the jury also returned a verdict in favor of plaintiffs on their claim for intentional interference with contractual relations, which plaintiffs asserted as an alternative to their breach of contract claim. Because we ultimately uphold the judgment on the claim for breach of contract, we need not—and do not—discuss the intentional interference claim further.

found the facts necessary to establish the elements of [the] cause of action"); *see also Summerfield v. OLCC*, 366 Or 763, 777, 472 P3d 231 (2020) ("When there is no evidence from which a reasonable trier of fact could find facts sufficient to establish an element of the party's claim, the opposing party is entitled to a directed verdict on the claim.").

### A.   *Breach of Contract Claim*

#### 1.   *The Court of Appeals' decision*

On appeal, the Court of Appeals upheld the denial of the directed verdict as to the breach of contract claim, given how the motion had been litigated in the trial court and on appeal. *Adelsperger II*, 322 Or App at 816-20. The Court of Appeals explained that the trial court had considered the evidence sufficient to permit the breach of contract claim to go to the jury on a common-law theory—regardless of any statutory requirements—and had treated the complaint as having been implicitly amended to conform to the evidence. *Id.* at 818. However, as the Court of Appeals further explained, not only did defendant fail to argue to the trial court that it should not have amended the pleading under the circumstances of this case, but it also failed to assign error to that ruling. *Id.* at 818-19. Thus, the Court of Appeals concluded that it would be improper to consider the propriety of the amendment as a basis for reversal. *Id.* at 819.

As a result, the court proceeded with the understanding that plaintiffs' complaint had been "implicitly amended to assert an equitable servitude or a covenant running with the land, as the basis by which the membership contracts (or at least some parts of them) became binding on defendant when it purchased the land." *Id.* So understood, the Court of Appeals explained that it could not conclude that the trial court had erred in denying the motion for a directed verdict, because defendant had not made "any substantive argument to the trial court as to why the evidence was insufficient to prove an equitable servitude (or a covenant running with the land), asserting only that it was 'not what [plaintiffs] pled.'" *Id.* (brackets in *Adelsperger II*). That disposition, the court reasoned, made it unnecessary

to address defendant's arguments about the meaning and application of the statutes governing membership camping contracts. *Id.* at 820.

### 2. *Resolution of the parties' contentions on review*

On review, defendant contends that it did not need "to explain why the evidence was insufficient to prove an equitable servitude (or a covenant running with the land)[,] because * * * the contracts could not be enforced as servitudes for reasons unrelated to the sufficiency of evidence to prove the elements of a common law servitude."[11] (Internal quotation marks omitted.) In support of that contention, defendant identifies two reasons that the contracts could not be enforced as servitudes. First, because the "statutory scheme" governing membership camping contracts "establishes a comprehensive set of rights, protections, and remedies for those who purchase these kinds of contracts," the contracts cannot become binding as a common-law servitude on a subsequent purchaser of the real property on which a campground is operated. In other words, the statutes that govern membership camping contracts—as demonstrated by their text, context, and legislative history—preclude the contracts from being enforced as common-law servitudes. Second, "even if the membership camping contracts had become binding on defendant as servitudes," those servitudes, as a matter of law, "*cannot* be enforced through a claim for breach of contract" against defendant—a subsequent purchaser of the real property who "was not a party" to the contracts and "who was neither in contractual privity nor an assignee of the contracts." (Emphasis in original.)

To be sure, plaintiffs alleged a breach of contract claim. However, when defendant moved for a directed verdict, the trial court viewed the pleadings as having been amended to conform to the evidence. *See* ORCP 23 B

---

[11] "'Servitude' is the generic term that describes legal devices private parties can use to create rights and obligations that run with land." *Restatement (Third) of Property (Servitudes)* § 1.1 comment a (2000). A "covenant that runs with the land" is a type of servitude. *See id.* § 1.3(1) ("A covenant that is a servitude 'runs with the land.'"). Because "covenants running with the land" and "equitable servitudes" are both types of servitudes and because this case does not require us to address any differences between them, we use the generic term "servitude" throughout this opinion for ease of reference.

(providing that pleadings may be amended "to cause them to conform to the evidence"). The court explained that, based on the evidence presented, the contracts could be binding on defendant as a servitude under common-law principles. Defendant's only response was that plaintiffs had pleaded a claim for the breach of membership camping contracts and had not pleaded "any sort of equitable servitude" nor requested "some common law benefit."

Eventually, the trial court instructed the jury consistently with its view that, based on the evidence presented, the contracts could be binding on defendant as a servitude. Specifically, the court instructed the jury that "[a] contract is a legally enforceable promise or set of promises" and that "[a] breach of contract occurs when a party fails to perform as required by the contract." The court explained that a covenant running with the land is a "binding promise." To create a covenant running with the land that binds successors, the court told the jury that four requirements must be satisfied: (1) "[t]here must be privity of the estate between the promisor and his successors" and such privity "arises out of the transfer of an interest in land to a successor"; (2) "[t]he promisor and promisee must intend that the covenant run"; (3) "[t]he covenant must touch and concern the land of the promisor"; and (4) "the promisee must benefit in the use of some land possessed by him or her as a result of the performance of the promise."[12]

The court also told the jury that "[c]ovenants running with the land are not binding on bona fide purchasers for value." The court contrasted a bona fide purchaser for value, who purchases "land without actual or inquiry notice of an unrecorded interest in the land" and "takes title to such land free and clear of unrecorded interests," with a

---

[12] *See Johnson v. Highway Division*, 27 Or App 581, 584, 556 P2d 724 (1976), *rev den*, 277 Or 99 (1977) ("Before a covenant may be said to run with the land and be binding upon a promisor's successors in interest, four requirements must be met: (1) there must be privity of the estate between the promisor and his successors; (2) the promisor and promisee must intend that the covenant run; (3) the covenant must touch and concern the land of the promisor; and (4) the promisee must benefit in the use of some land possessed by him as a result of the performance of the promise." (Citing *Huff v. Duncan*, 263 Or 408, 411-12, 411 n 2, 502 P2d 584 (1972) (emphasis omitted).)); *see also Butler Family LP v. Butler Brothers, LLC*, 283 Or App 456, 463, 388 P3d 1135 (2017) (same).

purchaser "who has notice of facts that would provoke a reasonable or prudent person to inquire," who is "charged with knowledge of what the purchaser would have discovered upon a reasonable inquiry and is not a bona fide purchaser of value." The court told the jury that, in this case, defendant contended that it was a bona fide purchaser for value.

Significantly, defendant did not assign the trial court's treatment of the pleadings as amended to conform to the evidence as error in the Court of Appeals. And defendant did not raise an assignment of error challenging the trial court's jury instructions in that court. To the extent that defendant's overarching appellate contention that the contracts could not be enforced as servitudes suggests that the trial court's amendment of the pleadings or the court's instructions to the jury were erroneous, those issues are not properly before us. *See State v. Link*, 367 Or 625, 638, 482 P3d 28 (2021) ("Just as an issue that was not preserved at the trial court ordinarily is not amenable to consideration by the Court of Appeals, issues that were not raised in a party's brief to the Court of Appeals ordinarily will not be considered by this court."); ORAP 5.45(1) ("No matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court and is assigned as error in the opening brief in accordance with this rule[.]"). Thus, under the circumstances, we need not—and do not—consider the correctness of the trial court's amendment of the pleadings to conform to the evidence or its instructions to the jury, but, instead, proceed with the understanding that the pleadings were amended to claim that the contracts were binding on defendant as a common-law servitude as the jury was ultimately instructed.

To the extent that defendant now contends that, as a matter of law, the membership camping contracts could not be enforced as servitudes, its fundamental problem is that it did not raise that contention in the trial court when it moved for a directed verdict. *See Peeples v. Lampert*, 345 Or 209, 219, 191 P3d 637 (2008) (explaining that "[t]he general requirement that an issue, to be raised and considered on appeal, ordinarily must first be presented to the trial court is well-settled in our jurisprudence" and that "[p]reservation

gives a trial court the chance to consider and rule on a contention, thereby possibly avoiding an error altogether or correcting one already made, which in turn may obviate the need for an appeal"). Defendant's argument in this court is essentially that the statute governing membership camping contracts preempts, as a matter of law, a common-law breach of contract claim based on an equitable servitude. But defendant did not raise a preemption argument in the trial court. If it had, the court would have had the benefit of briefing on that argument.

Again, when the trial court conformed the pleadings to the evidence, defendant's only response was that plaintiffs had pleaded a breach of contract claim and had not pleaded a servitude or requested a common-law remedy. Defendant did not contend, as it does on review, that the membership campground statutes were a comprehensive scheme that precluded the contracts from being enforced as common-law servitudes or that, even if the contracts were binding on defendant as servitudes, servitudes cannot be enforced through a breach of contract claim against a defendant who was not in contractual privity and was not an assignee. *See* ORCP 60 ("A motion for a directed verdict shall state the specific grounds therefor."). Put simply, in moving for a directed verdict, the contentions that defendant raised in the trial court—*viz.*, that plaintiffs had not complied with the requirements of the membership campground statutes and had not pleaded a servitude or requested a common-law remedy—are qualitatively different than its current contentions.

We acknowledge that, in arguing to the trial court that it was not bound by the contracts, defendant relied on *LDS*, 280 Or App 611, a case in which the Court of Appeals rejected the city's argument that a successor developer—who was neither "a party nor an assignee"—was bound by a development agreement simply by becoming owner of property previously owned by a party to the agreement. *Id.* at 614; *see also Sander v. Nicholson*, 306 Or App 167, 185, 473 P3d 1113, *rev den*, 367 Or 290 (2020) (stating that "merely to say that a party has succeeded to a predecessor's interest in land does not say enough to explain why the successor should somehow be bound by a predecessor's agreement").

On review, however, defendant focuses our attention on a different aspect of *LDS* and *Sander*. According to defendant, those cases stand for the proposition that "a legal claim for breach of contract and an equitable claim to enforce a contract as an equitable servitude are qualitatively different claims." (Internal quotation marks omitted.) To the extent that defendant is implying that its reliance on those cases demonstrates that it raised the contention that the contracts could not be enforced as servitudes in moving for a directed verdict, we disagree.

As in this case, the parties in *LDS* and *Sander* had alleged a breach of contract claim but had not pleaded that the contractual obligations constituted covenants or servitudes that ran with the land to bind successors. However, unlike in *LDS* and *Sander*, any pleading deficiencies in this case were resolved when the trial court amended them to conform to the evidence. If defendant's position was that the trial court could not amend the pleadings to permit the contracts to become binding as a servitude because the statutes precluded the court from doing so, it was incumbent on defendant to alert the trial court. But, as we have explained, not only did defendant fail to do that, it also did not challenge on appeal the trial court's amendment of the pleadings.

Defendant also argues that, even if the contracts were binding on defendant as servitudes, servitudes cannot be enforced through a breach of contract claim in the absence of contractual privity. In general, "privity of contract" is "an essential prerequisite to a breach of contract claim." *Adelsperger I*, 371 Or at 72. However, having amended the pleadings to conform to the common-law servitude theory, the trial court appears to have dispensed with any "privity of contract" requirement in its instructions to the jury. Instead, as previously described, the trial court instructed the jury on the elements of a covenant running with the land: (1) "[t]here must be privity of the estate between the promisor and his successors" and such privity "arises out of the transfer of an interest in land to a successor"; (2) "[t]he promisor and promisee must intend that the covenant run"; (3) "[t]he covenant must touch and concern the land of the

promisor"; and (4) "the promisee must benefit in the use of some land possessed by him or her as a result of the performance of the promise." Again, on appeal, defendant did not challenge the trial court's amendment of the pleadings to conform to the evidence or its jury instructions.

Accordingly, we express no opinion on the substantive correctness of defendant's contentions related to the trial court's denial of its directed verdict motion on the breach of contract claim, leaving those issues for another day. Instead, like the Court of Appeals, we conclude that, under the circumstances of this case, defendant has presented no basis for reversing the trial court's ruling.

On review, defendant asserts that we have an independent obligation to interpret the statutes in ORS chapter 94 that govern membership camping contracts to determine if they preempt common-law claims. *See Strasser v. State of Oregon*, 368 Or 238, 260, 489 P3d 1025 (2021) ("[W]e have an independent duty to correctly interpret any statute that comes before us, regardless of the arguments and interpretations offered by the parties."). However, that principle applies when we are undertaking the task of interpreting a statute, and as we have explained, the issue of whether the statutory scheme precludes the enforcement of the contracts as servitudes is not properly before us in this case.

Alternatively, defendant requests that we engage in plain error review to resolve whether the statutes preclude the enforcement of contracts as common-law servitudes. *See Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991) (explaining that a "plain error" is (1) an error of law; (2) obvious and not reasonably in dispute; and (3) apparent on the record). However, the legal point is not obvious. As this court has explained, "the enactment of a statute concerning a particular subject does not necessarily eliminate related common-law rules." *Espinoza v. Evergreen Helicopters, Inc.*, 359 Or 63, 88, 376 P3d 960 (2016); *see also Brown v. Transcon Lines*, 284 Or 597, 610-11, 588 P2d 1087 (1978) ("As a general rule, if a statute which provides for a new remedy shows no intention to negate, either expressly or by necessary implication, a pre-existing common law remedy, the new remedy will be regarded as merely cumulative,

rather than exclusive, with the result that a plaintiff may resort to either the pre-existing remedy or the new remedy. This rule is particularly applicable when the new statutory remedy is not an adequate one." (Footnotes omitted.)).

Here, the statutory scheme for membership campground contracts provides purchasers no mechanism to record their individual membership contracts,[13] and ORS 94.989 of that statutory scheme expressly incorporates other remedial statutes, which do not preempt common-law claims. For example, plaintiffs point out that ORS 94.989(3)—a provision of the membership campground statutes—allows for the rights of purchasers to be protected through application of the provisions of the Unlawful Trade Practices Act (UTPA), and that ORS 646.656—a provision of the UTPA—expressly provides that "[t]he remedies provided" in the UTPA "are in addition to all other remedies, civil or criminal, existing at common law or under the laws of this state." And if, under ORS 94.989(2) of the membership campground statutes, the rights of purchasers are "retail installment contracts" governed by ORS 83.010 to 83.190, as defendant asserts, then ORS 83.160 expressly provides that "[n]o act or agreement of the retail buyer before or at the time of the making of a retail installment contract *** shall constitute a valid waiver of *** any remedies granted to the buyer by law." Therefore, we decline defendant's invitation to engage in plain error review. That conclusion obviates the need for us to address defendant's appellate contentions concerning preemption of common-law servitudes by the statutes governing campground membership contracts.

B.  *Elder Abuse Claim*

1.  *The Court of Appeals' decision*

On appeal, defendant contended that there was legally insufficient evidence to support a verdict under either of plaintiffs' theories for elder abuse: (1) a wrongful taking or appropriation of an elderly person's money or property, *see* ORS 124.110(1)(a) (so providing); or (2) a withholding of money or property of an elderly person in bad faith,

---

[13] Responding to the question "[a]nd so the membership campgrounds contracts themselves *** can't be recorded, can they[,]" Hanifin of the Oregon Real Estate Agency testified, "I don't believe they can, no."

*see* ORS 124.110(1)(b) (so providing). *Adelsperger II*, 322 Or App at 822. As to the latter theory under ORS 124.110(1)(b), the Court of Appeals concluded that it had failed under the reasoning in *Bates*. *Id.* at 822-24; *see Bates*, 362 Or at 339 (concluding that "[a]llegations that an insurance company, in bad faith, delayed the processing of claims and refused to pay benefits owed to vulnerable persons under an insurance contract do not state a claim under ORS 124.110(1)(b) for wrongful withholding of 'money or property,'" because the benefits being withheld were not the same money or property received from the vulnerable person (*i.e.*, premiums) (footnote omitted)). And, as to the former theory under ORS 124.110(1)(a), the Court of Appeals applied the standard for whether conduct is "wrongful" that it had first announced in *Church v. Woods*, 190 Or App 112, 118-19, 77 P3d 1150 (2003). In *Church*, citing the "improper motive" or "improper means" test used in a case involving the tort of "wrongful" interference with contractual relations,[14] the Court of Appeals concluded that "[t]hat dual meaning of the word 'wrongful,' focusing alternatively on the defendant's motives or the means by which property was taken is sensible in the context of ORS 124.110(1)(a)" and adopted that standard. *Id.* at 118-19. Applying that standard to this case, the Court of Appeals concluded that plaintiffs had failed to demonstrate an improper means or motive needed to establish that any taking of plaintiffs' property was "wrongful." *Adelsperger II*, 322 Or App at 824-27. The court explained that plaintiffs' "improper means" argument—that the interference

---

[14] The Court of Appeals in *Church* noted:

"Conduct generally is 'wrongful' if it is carried out in pursuit of an improper motive or by improper means. *See, e.g.*, *Empire Fire & Marine Ins. v. Fremont Indemnity*, 90 Or App 56, 62, 750 P2d 1178 (1988) (defining 'wrongful' interference with contractual relations in those terms). 'Improper means' must be independently wrongful by reason of statutory or common law, beyond the mere fact of the injury complained of. *Conklin v. Karban Rock, Inc.*, 94 Or App 593, 601, 767 P2d 444, *rev den*, 307 Or 719 (1989). Improper means, for example, include 'violence, threats, intimidation, deceit, misrepresentation, bribery, unfounded litigation, defamation and disparaging falsehood.' *Id.* The use of undue influence also constitutes an 'improper means,' in that it involves the procurement of an unfair advantage. *See Smith v. Ellison*, 171 Or App 289, 294, 15 P3d 67 (2000) (stating that 'the emphasis in undue influence cases should be on the unfairness of the advantage which is reaped as a result of wrongful conduct' (internal quotation marks omitted))."

190 Or App at 118-19.

with their use of the resort constituted a conversion—failed because conversion relates "only to chattels," not real property, *id.* at 825, and that plaintiffs' "improper motive" argument failed because "plaintiffs [had] not pointed to any evidence in support of their assertion that defendant had an 'improper purpose' in deciding not to honor the contracts, *i.e.*, that defendant's intent was specifically to injure plaintiffs *as such*," *id.* at 826-27 (emphasis in original). Accordingly, the Court of Appeals concluded that the trial court had erred in denying defendant's motion for a directed verdict on the elder abuse claim. *Id.*

### 2. *Resolution of the parties' contentions on review*

Because it is dispositive, we turn to plaintiffs' theory of liability under ORS 124.110(1)(a).[15] Liability under ORS 124.110(1)(a) requires a defendant to "*wrongfully* take[] or appropriate[] money or *property*" of an elderly person. (Emphases added.) Thus, we must determine whether there was no evidence from which the jury could have found the facts necessary to establish the elements of plaintiffs' elder abuse claim—*viz.*, that defendant took or appropriated plaintiffs' "property" and that the taking or appropriation was "wrongful."

#### a. "Taking or appropriation" of "property"

The legislature did not define the terms "take," "appropriate," or "property" for purposes of ORS 124.100 to 124.140. When "the legislature has not defined a particular term, we assume that the legislature intended to give words of common usage their 'plain, natural, and ordinary meaning'" and look to the dictionary for definitions of the term. *See State v. Clemente-Perez*, 357 Or 745, 756, 359 P3d 232 (2015) (quoting *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993)). "But if the context or legislative history of a statute indicate that the legislature intended a term to have a meaning 'drawn from a specialized trade or field,' so-called 'terms of art,' we consider 'the meaning and usage of those terms in the discipline

---

[15] As we will explain, we ultimately conclude that plaintiffs demonstrated that defendant wrongfully took or appropriated their property for purposes of ORS 124.110(1)(a). For that reason, we need not address the parties' arguments about whether defendant was liable under ORS 124.110(1)(b).

from which the legislature borrowed them.'" *Marshall v.
PricewaterhouseCoopers, LLP*, 371 Or 536, 541, 539 P3d 766
(2023) (quoting *Comcast Corp. v. Dept. of Rev.*, 356 Or 282,
296, 337 P3d 768 (2014)). The parties have offered no context
or legislative history, nor have we found any, indicating that
the legislature intended those words in ORS 124.110(1)(a) to
be given anything other than their ordinary meaning.

As pertinent here, the ordinary meaning of "take" is
"to transfer into one's own keeping : to enter into or arrange
for possession, ownership, or use of." *Webster's Third New
Int'l Dictionary* 2330 (unabridged ed 2002). To "appropri-
ate" is defined as "to claim or use as if by an exclusive or
preeminent right." *Id.* at 106. And "property" is defined to
mean (1) "something that is or may be owned or possessed";
(2) "the exclusive right to possess, enjoy, and dispose of a
thing : a valuable right or interest primarily a source or ele-
ment of wealth"; or (3) "something to which a person has a legal
title : an estate in tangible assets (as lands, goods, money)
or intangible rights (as copyrights, patents) in which or to
which a person has a right protected by law." *Id.* at 1818.

Here, plaintiffs contend that the membership con-
tracts were enforceable as a "covenant running with the
land" or an "equitable servitude"—an interest that gave
plaintiffs a present property right to "the use and occu-
pancy" of the resort—and that defendant took or acquired
that property interest by refusing to honor the contracts and
permit their use of the property. They maintain that the
Court of Appeals was incorrectly "centered on the interfer-
ence with economic relations or economic interests aspect
of tort law, instead of an interference with general property
interests, which the statute was designed to protect."

Whether plaintiffs' right to the use or occupancy of
the resort is defined in terms of a membership camping con-
tract or a contract enforceable as a covenant running with
the land or an equitable servitude, we conclude that it falls
within the broad definition of "property" that can be taken
or appropriated for purposes of ORS 124.100 to 124.140. *See*
ORS 94.953(6) ("'Membership camping contract' means an
agreement offered or sold within this state granting the
purchaser the right or license to use for more than 30 days

the campgrounds and facilities of a membership camping operator and includes a membership which provides for such use."); ORS 94.953(10) ("'Purchaser' means a person who enters into a membership camping contract and obtains the right to use campgrounds and outdoor facilities of a membership camping operator."); *see also Restatement (Third) of Property (Servitudes)* § 1.1(1) (2000) ("A servitude is a legal device that creates a right or an obligation that runs with land or an interest in land.").

As explained above, the trial court instructed the jury as to the requirements of a covenant running with the land. 373 Or at 640. The trial court also instructed the jury that, "[t]o take" means to "transfer into one's own use, possession or ownership" and that "[t]o appropriate property of another means to exercise control over property of another permanently or for so extended a period or under such circumstances as to acquire the major portion of the economic value or benefit of such property."

The evidence in this case was sufficient to permit a factfinder to find that defendant took or appropriated plaintiffs' right to the use and enjoyment of the resort: (1) there was evidence that the contracts concerned the land of Elkside, the promisor; (2) there was also some evidence, including the prior nondisturbance agreements, the reduction of the resort's sale price to $1.995 million, and the email communication between Mike Smalley and the Barnetts about the number and terms of the contracts, from which a reasonable trier of fact could conclude that plaintiffs and Elkside's owners (the Smalleys) intended the contracts to run with the land and be binding on their successors; (3) there was evidence of privity of estate between Elkside and defendant through the sale of the property; (4) there was evidence that defendant proceeded with the sale with actual notice of the contracts; (5) there was evidence that, as a result of the performance of the promise, plaintiffs would benefit in their use of the campground land in a number of ways, including the use of the campground for the critical purpose of housing for a significant portion of the year; and (6) there was evidence that defendant claimed an exclusive or preeminent right to the land, denying and depriving plaintiffs of all use

consistent with their contracts. Thus, we cannot say that there is no evidence from which a reasonable trier of fact could find facts sufficient to establish that defendant "took or appropriated plaintiffs' property" for purposes of plaintiffs' ORS 124.110(1)(a) claim.

> b.   "Wrongful" taking or appropriation

Having concluded that the jury permissibly found that defendant took or appropriated the property of plaintiffs, we turn to the issue of whether a reasonable jury could find that the taking or appropriation was "wrongful," as that term is used in ORS 124.110(1)(a). The statute also does not define the term "wrongfully." We resolve that issue by applying our usual analysis from *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009), to the term "wrongfully" in ORS 124.110(1)(a).

The ordinary definition of the adjective "wrongful" refers broadly to that which is "full of wrong : INJURIOUS, UNJUST, UNFAIR." *Webster's* at 2642. Relatedly, the noun "wrong" has a variety of meanings, including "an injurious, unfair, or unjust act." *Id.* at 2641. However, it can also refer more narrowly to "a violation of the legal rights of another : an invasion of right to the damage of the party who suffers it : TORT." *Id.* As we will explain, context and legislative history indicate the legislature most likely intended "wrongfully," in ORS 124.110 (1)(a), to include acquisitions of the money or property rights of vulnerable persons under circumstances that are injurious, unjust, or unfair, taking into account the special vulnerability of the protected persons to such taking or appropriation.

As pertinent to our analysis here, the civil cause of action for financial elder abuse was originally enacted in 1995 as an action for "fiduciary abuse." Or Laws 1995, ch 671, § 3. As enacted, ORS 124.110(1)(a) (1995) expressly provided:

> "(1)   An action may be brought under ORS 124.100 for fiduciary abuse in the following circumstances:

> "(a)   When a person, including but not limited to a person who has the care or custody of an elderly or incapacitated person or who stands in a position of trust to an elderly or incapacitated person, takes or appropriates money or property of the elderly or incapacitated person

for any wrongful use or for any purpose not in the due and lawful execution of the trust or duty of the person."

The action was part of several provisions in Senate Bill (SB) 943 (1995) introduced at the request of Lisa Bertalan, an elder-law attorney. The purpose of the bill was to "protect elders and incapacitated adults from physical or financial abuse," and to "prevent and provide a specific remedy" for

"physical abuse and financial exploitation from relatives, the new 'friend' who suddenly cuts the elderly person off from family and the rest of the world, phony contractors who sell the elderly person substandard services or unnecessary goods, and the acquaintance who suddenly becomes the elderly person's live-in caregiver in exchange for the deed to the family home or other property.'"

Testimony, Senate Committee on Judiciary, SB 943, Mar 23, 1995, Ex R (statement of Lisa Bertalan); *see also* Testimony, House Committee on Judiciary, SB 943, May 12, 1995, Ex D (statement of Lisa Bertalan) (providing similar testimony).

Bertalan explained that a statutory civil cause of action was needed because both criminal and civil tort remedies were insufficient. Testimony, Senate Committee on Judiciary, SB 943, Mar 23, 1995, Ex R (statement of Lisa Bertalan). As to the former, Bertalan noted that criminal actions were "rarely filed" because it was difficult to prove beyond a reasonable doubt that an elderly person was incompetent in giving away their money or that the abuser knew of that circumstance. *Id.* As to the latter, Bertalan explained that civil tort cases were "often unsuccessful because the abuser uses the victim's own money to pay for a vicious war of litigation," resulting in "blatant cases often settl[ing] for a pittance."[16] *Id.*

---

[16] Bertalan also shared details of one such blatant case which had received media attention in Deschutes County. Testimony, House Committee on Judiciary, SB 943, May 18, 1995, Ex C (statement of Lisa Bertalan attaching newspaper article). Bertalan's law firm had represented an elderly woman to recoup assets from a couple who had defrauded her after she became disabled from a stroke, leaving her penniless and in foster care. A grand jury indicted the couple on theft and kidnapping charges, but the defendants were acquitted because of insufficient evidence. Bertalan explained that her firm financed a $40,000 legal battle against the couple, who had used funds taken from the woman's accounts to finance their defense and drag out the litigation over the course of two years. *See also* Tape Recording, Senate Committee on Judiciary, SB 943, Mar 23, 1995, Tape 69, Side A (statement of Lisa Bertalan).

By contrast, SB 943 created "a separate cause of action for physical or financial abuse." *Id.* The cause of action provided for the recovery of economic and noneconomic damages. Further, as Bertalan noted, it provided for the recovery of "court costs, conservator or guardian fees and attorney fees and also allow[ed] the judge to impose a restraining order against an alleged abuser to prevent further abuse." *Id.* Bertalan explained that such remedies were also necessary because in some cases the amount at issue may be small, as is the case with "the door-to-door living trust salesman who swindles the elderly person out of their last $5,000 to purchase a revocable living trust that they don't need."[17] Tape Recording, Senate Committee on Judiciary, SB 943, Mar 23, 1995, Tape 69, Side A (statement of Lisa Bertalan). "While the money is not a significant amount, the elderly person is out their life savings and has a product that they don't need." *Id.*

In 1999, the Court of Appeals issued a decision in *White v. McCabe*, 159 Or App 189, 979 P2d 289 (1999), which interpreted the statute to require the existence of a *fiduciary* relationship. The decision arose out of a case in which the plaintiff had sold her North Portland home of 45 years to the defendant. *Id.* at 191. At the time, the plaintiff was 67 years old, had suffered two heart attacks, and had recently undergone open-heart surgery to install a pacemaker. *Id.* The Court of Appeals affirmed the grant of summary judgment to the defendant on the plaintiff's ORS 124.110(1)(a) claim on the basis that "there [was] no evidence of a fiduciary relationship as required by the plain language of the statute." *Id.* at 195.

The legislature quickly responded to the Court of Appeals' decision by enacting Senate Bill (SB) 6 (1999). The bill amended ORS 124.110(1)(a) to provide:

"(1)   An action may be brought under ORS 124.100 for financial abuse in the following circumstances:

"(a)   When a person wrongfully takes or appropriates money or property of an elderly or incapacitated person,

---

[17] References to door-to-door salesmen and contractors in the legislative history contradict the dissent's argument that the legislature intended to exclude ordinary arm's-length transactions from its scope. 373 Or at 668 (Garrett, J., dissenting).

without regard to whether the person taking or appropriating the money or property has a fiduciary relationship with the elderly or incapacitated person."

Senator Neil Bryant, Chair of the Senate Committee on the Judiciary who had also been involved in the passage of the 1995 legislation, introduced the bill to the committee with the statement that the bill was "in response to a recent Court of Appeals decision that narrowed some legislation that we passed in 1995 trying to protect the elderly and this bill will expand what we thought we'd done before." Tape Recording, Senate Committee on Judiciary, SB 6, May 6, 1999, Tape 167, Side A (statement of Sen Neil Bryant). In a work session regarding the bill in the House, Representative Lane Shetterly, Chair of House Committee on Judiciary's Subcommittee on Civil Law, explained that, under the bill, the absence of a fiduciary relationship "does not amount to a defense against responsibility for swindling somebody for their money." Tape Recording, House Committee on Judiciary, Subcommittee on Civil Law, SB 6, May 18, 1999, Tape 166, Side A (statement of Rep Lane Shetterly). As amended, ORS 124.110(1)(a) (1999) provided that an action for "financial abuse" could be brought when a person "*wrongfully takes or appropriates* money or property" of an elderly person. (Emphasis added.)

That textual change (*i.e.*, taking or appropriating in a manner that is wrongful as opposed to taking or appropriating for a use that is wrongful), focuses on the conduct of the person taking or appropriating an elderly person's money or property. And although the "takes" or "appropriates" language tracks similar language in the "theft" statutes (*see* ORS 164.015(1)), nothing in the legislative history suggests that the legislature intended the term "wrongfully" to be limited to theft-like acts. The theft-like examples were generally provided as examples of blatant cases. More importantly, the legislative history demonstrates concern that the criminal statutes and civil causes of action existing in 1995 had failed to protect the elderly and that the Court of Appeals in 1999 had construed the statute more narrowly than intended by limiting its application to fiduciaries. Other than that, the legislature did not explicitly discuss

the content or scope of the "wrongful" element in 1995 or 1999.

Nonetheless, we can glean from the legislature's discussions that the civil cause of action for the type of financial abuse described in ORS 124.110(1)(a) was not intended to create liability for every taking or appropriation that causes injury or damage. However, neither is the statute limited to actions that are already actionable under established tort law. Instead, the statute was intended to provide elderly persons with a cause of action to remedy acquisitions of their money or property that were wrongful because of the special vulnerability of the elderly to such taking or appropriation, where existing criminal and civil remedies had proven to be insufficient against fiduciaries and other persons engaged in the wrongful conduct, including friends, family members, caregivers, and even contractors.[18] To be liable, the person's conduct must be "wrongful." As a textual matter, applying the dictionary definition, that just means that the conduct must be "injurious" (presumably, knowingly injurious), unjust or unfair under the circumstances, taking into account the special vulnerability of the elderly.

Several additional facets of the statutory scheme governing elder abuse are consistent with that understanding and the legislative intent to provide vulnerable persons broad protection and a comprehensive remedial scheme. First, the legislature provided that the court has authority to "restrain and remedy" the abuse by "issuing appropriate orders." ORS 124.120.[19] Second, the legislature provided the

---

[18] The only other changes to ORS 124.110(1)(a) were enacted in 2005, when the legislature replaced the words "elderly or incapacitated" person in the statute with the defined term "vulnerable person." Or Laws 2005, ch 386, § 3. That definition expanded the scope of those protected to also include financially incapable persons and persons with disabilities. *Id.* § 1. There was no change to the term "wrongfully" in the statute.

[19] *See, e.g.*, ORS 124.120(2) (providing for the issuance of "[r]estraining orders, temporary injunctions or other actions as the court deems proper, including the acceptance of satisfactory performance bonds, the creation of receiverships, the appointment of qualified receivers and the enforcement of constructive trusts"); ORS 124.120(3) (providing for the issuance of orders "[o]rdering any person to divest direct or indirect interest or contact with any person or enterprise"); ORS 124.120(4) (providing for the issuance of orders "[i]mposing reasonable restrictions, including permanent injunctions on the future activities or investments of any person, including prohibiting any person from engaging in the same type

vulnerable person a cause of action not just against the person who has caused the financial abuse, but also against a person who has permitted another to engage in financial abuse if "the person knowingly acts or fails to act under circumstances in which a reasonable person should have known of the *** financial abuse." ORS 124.100(5).[20] Third, the legislature provided that a prevailing plaintiff shall be awarded damages resulting from the abuse (*i.e.*, all economic damages or $500, whichever amount is greater, and noneconomic damages). ORS 124.100(2)(a), (b);[21] *cf. Busch v. McInnis Waste Systems, Inc.*, 366 Or 628, 645, 468 P3d 419 (2020) (explaining, generally, that "[b]oth economic and noneconomic damages are intended to compensate a plaintiff for *** injuries"). Finally, the legislature included an entitlement to attorney fees. *See* ORS 124.100(2)(c); *cf. De Young v. Brown*, 368 Or 64, 72, 486 P3d 740 (2021) ("Unlike statutory or contractual attorney fees awards, the purpose of awarding equitable attorney fees is not to punish a wrongdoer or to make a plaintiff whole.").

As noted, the Court of Appeals, in *Church*, looked to the tort of intentional interference with economic relations to give meaning to the term "wrongful" in the context of ORS 124.110(1)(a). The Court of Appeals did so because the *gravamen* of that tort—which focuses on an actor's use of improper means or improper motive—captured what the Court of Appeals understood to be the types of conduct that the legislature likely intended to remedy. *See Top Service*

---

of endeavor or conduct to the extent permitted by the Constitution of the United States and this state").

[20] In other words, the statute does not permit third parties to ignore such conduct under circumstances in which a reasonable person should have known that a person has wrongfully taken or appropriated the money or property of a vulnerable person. The legislature's choice to include this provision in the statute detracts from the dissent's position that an entity can act in its own business interests and knowingly capitalize on another entity's wrongful taking of a vulnerable person's property. 373 Or at 672 (Garrett, J., dissenting).

[21] The provisions providing for the recovery of damages were amended in 2003 to provide for treble damages. Or Laws 2003, ch 211, § 1; *see* Tape Recording, House Committee on Judiciary, HB 2449, Mar 25, 2003, Tape 102, Side A (statement of Committee Counsel Bill Joseph) (explaining that the bill "increases the civil penalties for abuse of elderly or incapacitated persons to three times the amount of the actual economic or noneconomic damages incurred" and that the proponents of the bill indicate that it would "further discourage such abuse and encourage prosecution").

*Body Shop v. Allstate Ins. Co.*, 283 Or 201, 209, 582 P2d 1365 (1978) (holding that, in the context of the tort of intentional interference with economic relations, this court had held that a defendant's liability "may arise from improper motives or from the use of improper means"). We agree that the legislature intended the term "wrongful" in ORS 124.110 (1)(a) to include, at the very least, the framework of "improper motive" or "improper means" that is used in the context of the tort of intentional interference with economic relations. However, we see no indication that the legislature intended the term to be limited to the specific types of conduct that amount to intentional interference with economic relations. As noted above, the legislative history demonstrates concern that the criminal statutes and civil causes of action existing in 1995 had failed to protect the elderly. Nothing in the legislative history indicates that the statute was limited to theft-like takings or appropriations or actions that are already actionable under established tort law. We need not decide in this case, however, what additional conduct the legislature intended to include in the definition of "wrongful" for purposes of ORS 124.110(1)(a), given the manner in which this case was litigated.[22]

The trial court applied the standard articulated in *Church*, in reviewing the motion for directed verdict and in instructing the jury. The court instructed the jury that conduct is wrongful if it is "carried out in pursuit of an improper motive, by improper means or in bad faith," and that improper means are those that are "independently wrongful by reason of statutory or common law beyond the mere fact of the injury from plaintiff," including "violence, threats, intimidation, deceit, misrepresentation, bribery, unfounded litigation, defamation, undue influence, and disparaging falsehood." In the trial court, the parties did not object to use of that standard in deciding whether the claim should go to the jury or to the jury instructions on

_____

[22] Our acceptance of the trial court's instructions on "wrongful" conduct within the meaning of ORS 124.110 does not preclude us from interpreting that provision more broadly in another case, if the issue of statutory interpretation is presented. Without deciding the issue, we note that, when the legislature enacted ORS 124.110, the *Restatement (Second) of Torts* section 767 (1979) listed a number of factors, including but not limited to "the nature of the actor's conduct" and "the actor's motive," that might support a finding that conduct was wrongful.

what "wrongful" means in this context. Nor did either party assign error to the instructions on appeal or contend that that the trial court plainly erred in so instructing the jury. And as noted above, the Court of Appeals also applied that standard in this case. *Adelsperger II*, 322 Or App at 824-25.

Plaintiffs take issue with the Court of Appeals' standard in three respects. First, plaintiffs note that *Church* did not engage in a search for "legislative intent" and looked instead to the common law of intentional interference with economic relations to define the term "wrongfully." Second, they take issue with the standard to the extent that it fails to capture defendants whose actions may be prompted by mixed motives, some legitimate and others wrongful. With regard to whether defendant used "improper means," plaintiffs do not meaningfully challenge the Court of Appeals' conclusion that the conversion theory that they had raised on appeal was "untenable, because conversion relates only to chattels."[23] *Adelsperger II*, 322 Or App at 825-26. Instead, they contend that their argument concerning improper means was broader than the Court of Appeals recognized, and the court erred by limiting its improper-means inquiry to whether defendant had committed the tort of conversion. And finally, they maintain that reliance on a standard of what is wrongful in relation to economic relations may be too narrow to capture what is wrongful in relation to other types of legal interests, particularly interests in real property, such as the one at issue here. According to plaintiffs, the court should have examined "alternate path[s] in the current matter." Specifically, they maintain that the court should have examined whether defendant's means or motive was wrongful "by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of trade or profession." (Internal quotation marks omitted.)

---

[23] On review, plaintiffs make a passing reference to "conversion," which essentially consists of a footnote defining "equitable conversion" without any explanation as to why or how that concept might apply in this context. *See Black's Law Dictionary* 421 (12th ed 2024) (defining "equitable conversion" as "[a] change in the nature of property so that real property is treated as personal property, or vice versa, in certain circumstances"—the most common of which "involves transferring real property as the parties to a contract intended before the seller experienced a change in circumstances, such as marriage or death, that could affect title to the property").

The problem with plaintiffs' argument that "wrongful" as used in ORS 124.110(1)(a) means more than how the trial court and Court of Appeals defined the term is that plaintiff did not present these arguments and objections to the trial court at the directed verdict stage or later at the time the court instructed the jury. Thus, the only statutory interpretation question that is presented in this case is whether "wrongfully," as used in ORS 124.110(1)(a), includes conduct that fits the definition of the term as applied by the trial court to the directed verdict motion; and, if so, whether, on this record, there was sufficient evidence of wrongful conduct that the matter could lawfully be submitted to a jury for that determination. Having already answered the statutory interpretation question in the affirmative, we conclude the record was sufficient.

We disagree with the Court of Appeals that the evidence was legally insufficient to permit a reasonable factfinder to find that defendant acted with improper motive or improper means, and thus, engaged in conduct that was "wrongful" as defined in the jury instructions in this case. "Improper means," for purposes of the common-law tort of intentional interference with economic relations, broadly encompasses various forms of wrongful conduct. In cases involving undue influence, the issue is whether "the influencer by his conduct gained an unfair advantage by devices which reasonable men regard as improper." *In re Reddaway's Estate*, 214 Or 410, 419, 329 P2d 886 (1958). "Commonly included among improper means are violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." *See Top Service Body Shop*, 283 Or at 210 n 11; *see also Bates*, 362 Or at 344 (noting that wrongfully taking or appropriating money or property refers to "the improper acquisition by another person of the vulnerable person's money or property—such as by fraud, conversion, or theft").

However, by its terms, the list of common improper means in *Top Service Body Shop* was not exclusive, even in the context of the tort of intentional interference with economic relations. An interference that results in an injury need only be "wrongful by some measure beyond the fact

of the interference itself." *Top Service Body Shop*, 283 Or at 209. As this court later recognized in *Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or 487, 498, 982 P2d 1117 (1999), "if liability in tort is based on an actor's means, then the means must violate some objective, identifiable standard, such as a statute or other regulation, or a recognized rule of common law, or, perhaps, an established standard of a trade or profession." For example, in *Uptown Heights Associates v. Seafirst Corp.*, 320 Or 638, 652-55, 891 P2d 639 (1995), this court looked to the comments of the *Restatement (Second) of Torts* section 766 (1979) for when an entity's "refusal to deal" with another entity constituted an improper means (*i.e.*, "a form of affirmative inducement") that caused the other entity to breach its contract with a third party. In a claim such as this one, brought by vulnerable persons under a statutory scheme which authorizes the court to issue equitable remedies such as the imposition of a constructive trust and to hold even third parties liable for their knowing actions or inactions to prevent the wrongful taking of a vulnerable person's property, the court may also look to common-law equitable principles of unjust enrichment.[24] We further conclude that, at least for purposes of a claim by a vulnerable person under ORS 124.110(1)(a), the legislative history indicates that the legislature intended to capture individuals such as family members and even contractors who may not have as their sole purpose to inflict injury on the vulnerable person *as such*.

In this case, plaintiffs' theory was that, because defendant purchased the property for less than its appraised value and with full knowledge of plaintiffs' contracts and then refused plaintiffs their contractual benefits, including the right to use and enjoy the resort, a factfinder could infer that defendant acted wrongfully. At the directed verdict stage, plaintiffs' counsel made the following argument to the court:

---

[24] In *Tupper v. Roan*, 349 Or 211, 223, 243 P3d 50 (2010), this court explained that in order to prevail on an unjust enrichment claim, the plaintiff must establish that (1) "[the] property or property interest that rightfully belongs to [plaintiff] was taken or obtained by someone else under circumstances that in some sense were wrongful or inequitable"; (2) "the person who now possesses the property is not a bona fide purchaser for value and without notice"; and (3) "the property in the hands of that person, *** in fact is the very property that rightfully belongs to her, or is a product of or substitute for that property."

"I think the wrongful behavior here is in fact that
Mr. Barnett tricked the Smalleys into selling them the
property for half price. He never planned on enforcing the
contracts[.] And Mr. Krause, the real estate broker, told
them this property is selling cheap because you have to
honor these contracts."

That theory is grounded in evidence of two interrelated
circumstances.[25] First, defendant knew about plaintiffs'
membership contracts before closing on the property. And
second, defendant purchased the property for less than its
appraised value—a purchase price that reflected Elkside's
assessment that it "had to find the right person" because the
membership contracts "went with the park."

Plaintiffs' counsel argued further at the directed
verdict stage that "[Mr. Barnett] secretly was going to pull
the rug out from under all these people. All along he bought
\*\*\* the property at a discount for that purpose." And coun-
sel argued to the jury that defendant knew the member-
ship contracts existed and "made a strategic decision just
to cancel the contracts and decided to duke it out in court"
knowing that it "should have honored those contracts, and
in not doing so, [it] \*\*\* was injuring elderly people who had
a right to use it, who had been relying on that, and they are
damaged." He argued further that "[t]hey never intended to
honor these contracts. That's wrongful. That's in bad faith."

In other words, plaintiffs' theory was that defen-
dant's refusal to honor the membership contracts consti-
tuted "improper motive" or "improper means" for purposes
of the statutory definition of "wrongful," because defendant
would be unjustly enriched under common-law equitable
principles at the expense of the elderly plaintiffs, some of
whom lived full time at the campground, if defendant were
allowed to repudiate the membership contracts under those
circumstances.[26]

---

[25] We cite plaintiffs' arguments solely for purposes of explaining their unjust
enrichment theory. We do not necessarily endorse plaintiffs' characterization of
defendant's conduct by ultimately agreeing with plaintiffs that defendant's con-
duct was wrongful, or that a jury at least could find it to be wrongful for purposes
of ORS 124.110(1)(a).

[26] Recognizing the importance of membership camping contracts to purchas-
ers, the legislature also incorporated equitable principles into ORS 94.987, which

In light of how this case was litigated in the trial court, we agree with plaintiffs that the evidence was legally sufficient to permit a reasonable factfinder to find that defendant's conduct was "wrongful" for purposes of ORS 124.110(1)(a). First, there was evidence in the record that, at every step of the process—from receipt of advertisement materials to discussions and email communications with Elkside to website and onsite review—defendant was aware that Elkside had sold memberships that had been advertised as advantageous to "retirees" and plaintiffs were purchasers of "lifetime" membership campground contracts. Second, defendant was aware that "through their contracts," which Chris Barnett had reviewed, plaintiffs had purchased a "present property right" for "the use and occupancy" of the resort. There was also evidence in the record that defendant was aware that the members were "an elderly bunch," that some of them lived full time at the campground, and that all plaintiffs were entitled to use it as their home for a significant part of the year. Defendant was aware of the terms of the membership contracts and breached them, knowing that the Smalleys wanted the contracts to be honored and that the breach would deprive some plaintiffs of use of the campground as their home full time or for a significant part of the year. And finally, as noted above, defendant purchased the property for less than its appraised value—a purchase price that reflected Elkside's assessment that the membership contracts "went with the park"—only to turn around and deny the existence of the membership contracts and immediately experience an appreciation in the value of the property at the expense of the elderly plaintiffs.[27]

---

allows for the appointment of a trustee to protect against irreparable injury to the rights of purchasers of camping contracts.

[27] The dissent focuses incorrectly on the lack of any evidence in the record to support the original $5.9 million list price for the property to argue that there is no basis for reasonably inferring anything about the "true" value of the property in the absence of the membership contracts. 373 Or at 674 (Garrett, J., dissenting). The record does, however, include evidence of what went into the $2.8 million appraised value. That value was based solely on the RV Park real property, personal property (furniture, fixtures and equipment), and surplus land value. It did not include the membership contracts as encumbrances on the land. Thus, the record supports the conclusion that the RV Park was worth $2.8 million without the membership contracts and $1.995 million with the membership contracts, meaning that defendant "saved" nearly $1 million by purchasing the park at the lower value and then refusing to honor the membership contracts.

Accordingly, we cannot say that there is no evidence from which a reasonable factfinder could find that defendant's taking or appropriation of plaintiffs' property interest in their "lifetime" membership camping contracts was "wrongful" for purposes of plaintiffs' ORS 124.110(1)(a) claim, and we affirm the trial court's denial of defendant's motion for directed verdict as to that claim.

That does not mean that every person or business that enters into a contract with an elderly person faces potential liability for elder abuse if the contract is breached. Many contract breaches will not be "wrongful" as that term is used in ORS 124.110(1)(a). But the circumstances in this case were sufficient to permit a reasonable factfinder to find that it would be unjust to allow defendant to purchase the campground at a reduced price due, at least in part, to the "lifetime" membership contracts about which defendant was fully on notice, and then refuse to honor those contracts, knowing that such conduct deprived some elderly people of the place where they lived year round and others the use the campground as their home for a substantial part of the year.

The dissent contends that all defendant did here was act "to further its own legitimate business purposes." 373 Or at 663 (Garrett, J., dissenting). With respect, and viewing the evidence in the light most favorable to plaintiffs, as we must in reviewing the directed verdict motion, we disagree. We cannot conclude that defendant's attempt to save nearly $1 million at the expense of these plaintiffs under these circumstances served a "legitimate business purpose."

## IV.   CONCLUSION

In sum, in light of how this case was litigated, the trial court did not err in denying defendant's motion for a directed verdict on plaintiffs' breach of contract claim. The trial court also did not err in denying the directed verdict on plaintiffs' elder abuse claim under ORS 124.110(1)(a) (wrongful taking or appropriation).

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is affirmed.

**GARRETT, J.,** concurring in part and dissenting in part.

I would affirm the Court of Appeals decision in its entirety. I agree with the majority's analysis of the breach of contract claim and concur in that portion of today's decision. I disagree, however, with the majority's disposition of plaintiffs' elder abuse claim under ORS 124.110(1)(a). The Court of Appeals correctly held that the record in this case cannot reasonably support any finding that defendant acted through an "improper means" or with an "improper motive" when, after purchasing the campground from Elkside, it rejected the membership contracts that Elkside had executed with the plaintiffs. *Adelsperger v. Elkside Development LLC*, 322 Or App 809, 824-27, 523 P3d 142 (2022) (*Adelsperger II*). As this court has previously explained, a party that simply acts to further its own legitimate business purposes does not act "improperly" under the tort principles that govern this case. That is all that defendant did here.

Even when viewed in the light most favorable to plaintiffs, the evidence establishes, at most, that defendant was aware that Elkside *wished* for the contracts to be honored by whomever purchased the campground, and that the list price of the property may, in part, have reflected that desire. There is no evidence that defendant made any false representation about its intentions concerning the membership contracts. Nor is there evidence that defendant did anything but act in its own business interests, based on its reasonable understanding of its legal obligations in relation to plaintiffs' contracts with Elkside—an understanding objectively supported by the fact that there were no recorded encumbrances on the property concerning plaintiffs' interests. As a consequence of its decision, defendant can be held liable for damages on contract or quasi-contract theories, to be sure. But the upshot of the majority's decision is that, as punishment for making a judgment about its contractual obligations that was later adjudicated to be incorrect, defendant can be held liable not only for those ordinary damages, but for statutory treble damages for "abusing" persons who were not even parties to the transaction.

In passing ORS 124.110(1)(a), the legislature intended to address deceptive conduct and exploitation of the elderly by persons in a position to take advantage of them. The legislature did not intend to subject a party in an arm's-length transaction to treble damages if an ordinary breach of contract happens to affect a person 65 or older. Under the majority's analysis, however, most such cases will at least present a jury question as to whether the breaching party committed "elder abuse." The risk of ruinous, punitive liability for garden-variety commercial disputes (here, the $2.7 million verdict far exceeds the price that defendant paid for the real estate) will discourage rational people from doing business with seniors.

A.   *The majority misconstrues the elder abuse statute.*

I begin with the majority's statutory analysis of ORS 124.110(1)(a). The parties and the trial court all proceeded with the understanding that the term "wrongfully" in ORS 124.110(1)(a) has the meaning given it by the Court of Appeals in *Church v. Woods*, 190 Or App 112, 118, 77 P3d 1150 (2003), which that court adopted from the tort of intentional interference with economic relations. Consistently with *Church*, the parties argued, and the trial court later instructed the jury, that "wrongfully" means through an "improper means" or with an "improper motive." Thus, although plaintiffs on appeal have urged interpretations of the elder abuse statute that differ from what they argued below, the majority is correct to conclude that, in this procedural posture, the question before us is simply

> "whether 'wrongfully,' as used in ORS 124.110(1)(a), includes conduct that fits the definition of the term as applied by the trial court to the directed verdict motion; and, if so, whether, on this record, there was sufficient evidence of wrongful conduct that the matter could lawfully be submitted to a jury for that determination."

373 Or at 658. In other words, the question is whether the evidence can support a finding of elder abuse under the *Church* standard.

Despite properly framing that question, the majority undertakes a lengthy analysis suggesting that the legislature

actually intended for the elder abuse statute to have a more expansive meaning than the Court of Appeals gave it in *Church*. The purpose of that discussion is unclear, because the majority ends up reiterating that the court "need not decide in this case * * * what additional conduct the legislature intended to include in the definition of 'wrongful' for purposes of ORS 124.110(1)(a), given the manner in which this case was litigated." *Id.* at 656. However, because the majority has at least signaled that it will adopt a broader interpretation of the elder abuse statute in a future case, *id.* at 656 n 22, it is necessary to explain why I disagree with that interpretation.

Citing dictionary definitions, the majority notes that "wrongful" can refer broadly to something that is "injurious, unjust, or unfair" or, more narrowly, to a violation of another person's *legal* rights. In that narrower sense, the term "wrongful" is equivalent to "tortious." *See Webster's Third New Int'l Dictionary* 2641 (unabridged ed 2002) (defining the noun "wrong" to include "a violation of the legal rights of another : an invasion of right to the damage of the party who suffers it : TORT"). The majority concludes that the legislature intended the broader definition for the elder abuse statute, but that conclusion is not supported by the context or history of the law.

The civil cause of action provided in ORS 124.110 (1)(a) was originally introduced as part of Senate Bill (SB) 943 (1995). The main proponent of the bill was Lisa Bertalan, an elder-law attorney, who testified before both the Senate and House Judiciary Committees. Bertalan testified that a "majority" of recently reported elder abuse cases

> "were committed by relatives of the elderly person * * * or an acquaintance, so this is the person who befriends the elderly person in the community and is taking them to the bank to cash social security checks, all of a sudden moves in with the elderly person and is all of a sudden on the deed or on the title to the elderly person's property. That's the focus of this bill."

Tape Recording, Senate Committee on Judiciary, SB 943, Mar 23, 1995, Tape 69, Side A (statement of Lisa Bertalan).

Bertalan went on to describe her own experience representing elderly victims of such abuse, including a case involving a sister who obtained power of attorney and stole $150,000 worth of property, and one involving a woman who befriended an elderly man with Alzheimer's disease and then stole his money. *Id.* In another case, an in-home caregiver took an elderly woman on vacation, and, when the money ran out, dumped the woman in a nursing home in Arizona. Tape Recording, Senate Committee on Judiciary, SB 943, Apr 12, 1995, Tape 101, Side B (statement of Lisa Bertalan). The woman was eventually brought home to Oregon, but the in-home caregiver was nowhere to be found, and the elderly woman was left penniless. *Id.* Bertalan described that as "a very typical scenario that's occurring in the state." *Id.*

Bertalan testified that existing civil and criminal remedies often left elder abuse victims with little recourse against their abusers. "Criminal suits are rarely filed in elder abuse cases," Bertalan explained, "because it is usually difficult to prove beyond a reasonable doubt that the elderly person was incompetent when the abuse occurred, and you also lose your best witness, and that's the victim, a person who's usually suffering from some sort of dementia or Alzheimer's-type symptoms." Tape Recording, House Committee on Judiciary, SB 943, May 12, 1995, Tape 33, Side A (statement of Lisa Bertalan). Civil tort cases, meanwhile, "are often unsuccessful because the abuser usually has all of the elderly person's money," so the victim "doesn't have the finances to pursue litigation." *Id.* Additionally, "[a]busers know that the most they have to fear is a court order to give the money back and they tend to fight long and hard." Testimony, Senate Committee on Judiciary, SB 943, Mar 23, 1995, Ex R (statement of Lisa Bertalan). And "[c]onservators know that the Probate Court is uneasy about awarding big fees to the conservator for protracted litigation if the elderly victim may be left without enough to pay for the care she or he needs. Accordingly, blatant cases often settle for a pittance." *Id.*

In response to those concerns, SB 943 created "a separate cause of action for physical or financial abuse of an elderly person or incapacitated adult." *Id.* The cause of

action provided for the recovery of economic and noneconomic damages, court costs, conservator or guardian fees, and attorney fees, and it permitted the court to impose a restraining order against an alleged abuser to prevent further abuse. *Id.* The purpose of those provisions was

> "to prevent and *provide a specific remedy for physical abuse and financial exploitation* from relatives, the new 'friend' who suddenly cuts the elderly person off from family and the rest of the world, phony contractors who sell the elderly person substandard services or unnecessary goods, and the acquaintance who suddenly becomes the elderly person's live-in caregiver in exchange for the deed to the family home or other property."

*Id.* (emphasis added).

As initially enacted in SB 943, ORS 124.110(1)(a) (1995) provided that an action for "fiduciary abuse" could be brought when a person "takes or appropriates money or property of the elderly * * * person for any *wrongful* use or for any purpose not in the due and lawful execution of the trust or duty of the person." (Emphasis added.) A few years later, the Court of Appeals interpreted the statute to require the existence of a fiduciary relationship, based on the legislature's express use of the word "fiduciary." *White v. McCabe*, 159 Or App 189, 194-95, 979 P2d 289 (1999). In response, the legislature enacted SB 6 (1999), which amended ORS 124.110 (1)(a) to eliminate the requirement for such a relationship. *See* Tape Recording, Senate Committee on Judiciary, SB 6, May 6, 1999, Tape 167, Side A (statement of Committee Chair Sen Neil Bryant) (explaining the bill). As amended, ORS 124.110(1)(a) (1999) provided that an action for "financial abuse" could be brought when a person "*wrongfully* takes or appropriates money or property" of an elderly person, regardless of any fiduciary relationship. (Emphasis added.)

The legislature never expressly discussed the intended meaning of the word "wrongfully" in either bill. The majority concludes that, because the legislature viewed existing remedies as inadequate, the legislature must have intended for the statute to reach *conduct* that would not otherwise, at that time, have been a basis for civil or criminal liability. But that is a misreading of the history.

The testimony by Bertalan reflects that existing crimi-
nal and civil remedies were inadequate, but that was not
because existing law failed to cover the types of conduct
that Bertalan described as abusive. On the contrary, the
examples that Bertalan gave describe fraud, theft, coercion,
or other conduct that already would have been unlawful.[1]
Rather, existing remedies were inadequate for procedural
and practical reasons: As noted above, criminal remedies
posed the problem of requiring proof beyond a reasonable
doubt, while common-law tort remedies were of limited help
because an abuser might be controlling the very funds that
an elderly victim would need to retain counsel and bring a
lawsuit. The legislature therefore responded by creating a
new statutory remedy, including provisions for recovery of
attorney fees and, eventually, treble damages.[2]

In sum, the legislative history of ORS 124.110(1)(a)
does not support the majority's interpretation of "wrongful"
as broadly meaning any conduct that is "injurious," "unjust,"
or "unfair." As the majority notes, the term "wrongful" is
readily susceptible to a narrower meaning that connotes *tor-
tious* conduct. In light of the examples of "elder abuse" that
it considered in passing the bill, it is more likely that the

---

[1] The majority points to a couple of references in the legislative history to
door-to-door salesmen and "contractors" to refute what it characterizes as my
position that the elder abuse statute was not intended to cover any arm's-length
transactions. 373 Or at 652 n 17. That is not my position. Rather, the statute
was not intended to cover *ordinary* arm's-length transactions, meaning those
that lack coercion, deception, or other features that would have made a person's
conduct criminal or tortious. The use of words such as "phony" and "swindle"
during legislative discussions supports that conclusion. *See, e.g.*, Testimony,
Senate Committee on Judiciary, SB 943, Mar 23, 1995, Ex R (statement of Lisa
Bertalan) (describing cases of "phony contractors who sell the elderly person sub-
standard services or unnecessary goods"); Tape Recording, Senate Committee on
Judiciary, SB 943, March 23, 1995, Tape 69, Side A (statement of Lisa Bertalan)
(describing cases where door-to-door living trust salesman "swindles" elderly
person out of their life savings); Tape Recording, House Committee on Judiciary,
SB 6, May 18, 1999, Tape 166, Side A (statement of Committee Chair Rep Lane
Shetterly) (describing the bill as "extend[ing] liability to someone who swindles,
who commits fraud, and gets money that way").

[2] As the majority notes, the treble damages provision was added in 2003 in
House Bill (HB) 2449. Or Laws 2003, ch 211, § 1. That bill "increase[d] the civil
penalties for abuse of elderly or incapacitated persons to three times the amount
of the actual economic or noneconomic damages incurred" and the proponents of
the bill indicated that it would "further discourage such abuse and encourage
prosecution." Tape Recording, House Committee on Judiciary, HB 2449, Mar 25,
2003, Tape 102, Side A (statement of Committee Counsel Bill Joseph).

legislature meant "wrongful" in that narrower sense than that the legislature intended to adopt open-ended, subjective, and standardless concepts such as "unjust" and "unfair."[3] Indeed, the majority acknowledges that, based on the legislative history, "ORS 124.110(1)(a) was not intended to create liability for every taking or appropriation that *causes injury or damage*." 373 Or at 654 (emphasis added). Yet, the majority's interpretation allows just that. The majority states that the conduct must be "'injurious' (presumably, knowingly injurious), unjust or unfair under the circumstances, taking into account the special vulnerability of the elderly." *Id*. It thus appears that, in the majority's view, *any* conduct that could be regarded as "unfair" to a person 65 or older will at least present a jury question as to whether the conduct was "wrongful."[4]

B.  *Under the standard that the trial court applied, the evidence is legally insufficient to conclude that defendant acted through an improper means or for an improper purpose.*

I next turn to what the majority appears to agree is the actual question posed by this case, which is whether the record can support liability under *Church*.

Under that standard, to act "wrongfully" refers to conduct that is "carried out in pursuit of an improper motive or by improper means." *Church*, 190 Or App at 118; *see also Top Service Body Shop v. Allstate Ins. Co.*, 283 Or 201, 209, 582 P2d 1365 (1978) (in the context of the tort of intentional interference with economic relations, a defendant's liability "may arise from improper motives or from the use of improper means"). An interference that results in an injury must be "wrongful by some measure beyond the fact of the interference itself." *Top Service Body Shop*, 283 Or at 209; *see also Northwest Natural Gas Co. v. Chase Gardens, Inc.*,

---

[3] Although the majority implies that the legislature may have intended to incorporate *Restatement (Second) of Torts* section 767 (1979), 373 Or at 656 n 22, there is no evidence that legislators were even made aware of that provision.

[4] As additional support for the notion that the legislature intended to adopt a more sweeping definition of "wrongfully," the majority observes that the statute imposes liability not only on persons who abuse the elderly, but on anyone who "has permitted" another person to engage in such abuse. 373 Or at 654-55. For such liability to exist, however, someone must still have acted "wrongfully." That aspect of the statute, in other words, does nothing to help us understand what "wrongfully" means.

328 Or 487, 498, 982 P2d 1117 (1999) ("Deliberate interference alone does not give rise to tort liability."). If liability is based on the actor's purpose, "then the purpose must be to inflict injury on the plaintiff 'as such.'" *Northwest Natural Gas Co.*, 328 Or at 498 (quoting *Top Service Body Shop*, 283 Or at 211). If liability is based on the actor's means, "then the means must violate some objective, identifiable standard, such as a statute or other regulation, or a recognized rule of common law, or, perhaps, an established standard of a trade or profession." *Id.* "Commonly included among improper means are violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." *Top Service Body Shop*, 283 Or at 210 n 11.

This court has emphasized that a party that acts to further its own business interests, without more, does not act tortiously. *Id.* at 212 (explaining that a defendant acting in "pursuit of its own business purposes as it saw them" would not have an improper motive; further noting that the evidence in that case was "wholly consistent with [the defendant's] pursuit of its own business purposes as it saw them and did not suffice to support an inference of the alleged improper purpose to injure [the plaintiff]"); *see also Northwest Natural Gas Co.*, 328 Or at 498 ("Generally, a defendant's subjective judgment as to its own business purposes will control.").

In this case, the directed verdict motion was argued, and the jury was instructed, consistently with those legal principles. The trial court told the jury that conduct is "wrongful" if it is carried out "in pursuit of an improper motive" or "by improper means." The court explained that "[i]mproper means must be independently wrongful by reason of statutory or common law beyond the mere fact of the injury from plaintiff. Examples include violence, threats, intimidation, deceit, misrepresentation, bribery, unfounded litigation, defamation, undue influence, and disparaging falsehood."

At trial, plaintiffs did not clearly identify any theory of an "improper means" through which defendant had acted.

Before the Court of Appeals, the only such theory plaintiffs advanced was that defendant had committed the tort of "conversion." As the Court of Appeals explained, that theory is untenable on this record because conversion applies only to chattels, not interests in real estate. *Adelsperger II*, 322 Or App at 825. That is a correct statement of law, and plaintiffs do not meaningfully contest it on review, nor do I understand the majority to take issue with that aspect of the Court of Appeals' analysis.

As for improper motive, plaintiffs' theory argued below was that, because defendant purchased the property for less than its appraised value and with the awareness that plaintiffs' contracts existed, defendant acted with an improper purpose when it refused to honor those contracts. That is the theory that the majority appears to accept in its discussion of "unjust enrichment" principles, although it is unclear whether the majority means to say that unjust enrichment constitutes an improper means, an improper purpose, or both.[5]

The majority explains plaintiffs' theory of liability as follows: "[B]ecause defendant purchased the property for less than its appraised value and with full knowledge of plaintiffs' contracts and then refused plaintiffs their contractual benefits, including the right to use and enjoy the resort, a factfinder could infer that defendant acted wrongfully." 373 Or at 659. In other words, the majority explains,

> "plaintiffs' theory was that defendant's refusal to honor the membership contracts constituted 'improper motive' or 'improper means' for purposes of the statutory definition of 'wrongful,' because defendant would be unjustly enriched under common-law equitable principles at the expense of the elderly plaintiffs, some of whom lived full time at the campground, if defendant were allowed to repudiate the membership contracts under those circumstances."

*Id.* at 660. In a footnote, the majority discusses the elements of an unjust enrichment claim.

---

[5] The majority draws no distinction between plaintiffs' improper means and improper motive theories in this case and appears to rely on principles of unjust enrichment as informing both inquiries.

That analysis is flawed for at least two reasons. First, the majority does not explain how incorporating principles of "unjust enrichment" can be squared with the case law regarding what it means to act "wrongfully" (*i.e.*, through an improper purpose or means) in this context. Under the *Church* standard, to act wrongfully means to act tortiously. But the theory that the majority accepts is not based on tortious conduct; it is based on a quasi-contract concept of unjust enrichment—an equitable theory used to make a party whole in the absence of an express contract. *See Kashmir v. Patterson*, 289 Or 589, 591-92, 616 P2d 468 (1980). Plaintiffs are already recovering contract damages in this case. Ordinarily, a party would not recover simultaneously under contract and quasi-contract theories for the same conduct. *See id.* (describing breach of an express contract and quasi-contract as alternative theories of recovery). Moreover, a party acting to further its own legitimate business purposes may be held liable for quasi-contract damages on an unjust enrichment theory, just as it may be held liable for breach of contract. But, until today, it had been clear that a party acting to further its own legitimate business purposes does not act *tortiously*. *Top Service Body Shop*, 283 Or at 212. The majority's ambiguous reliance on "principles of unjust enrichment" to support an inference of "wrongful" conduct under the *Church* standard is inconsistent with how those legal principles have previously been understood and applied.

Second, the majority's analysis depends on factual premises that the record does not support. The majority accepts the theory that defendant acted "with full knowledge" of plaintiffs' contracts and then refused to honor them. Thus, the majority seems to reason, at least implicitly, that defendant knew that plaintiffs' contracts constituted *enforceable property interests* which defendant lacked any reasonable basis for refusing to honor. But the record does not support a reasonable inference that defendant had such "knowledge."

For reasons the majority opinion alludes to but then ignores, defendant could reasonably have believed that it was not bound by the membership contracts. Membership

campgrounds are regulated by statute. Among the statutory requirements is that membership camping contracts shall not be sold unless a nondisturbance agreement is executed, delivered to the Real Estate Commissioner, and recorded in the "real estate records of the county in which the campground is located." ORS 94.986(1). A "nondisturbance agreement" is "an instrument by which the holder of a blanket encumbrance agrees that the holder's rights in the campground shall be subordinate to the rights of any membership camping contract purchaser." *Id.* As the majority notes, Elkside executed two nondisturbance agreements that referred to the purchasers of the contracts as vendees and provided for the protection of their contractual interests in the event of a foreclosure or conveyance in lieu of a foreclosure sale. On not one but *both* occasions, those nondisturbance agreements should have been filed with the county recorder but were not. In addition, even though Elkside and defendant both knew of plaintiffs' contracts, the closing documents for the sale of the campground to defendant did not include reference to any sort of encumbrance held by plaintiffs. All told, there were no identified encumbrances on the property concerning plaintiffs' interests. The majority notes those omissions in passing but gives them no significance. However, the serial failures to take the steps that *the law requires* to provide notice that plaintiffs held interests running with the land are sufficient to show, at the very least, that defendant could reasonably have questioned the legal status of plaintiffs' interests, and specifically, whether defendant was bound by the membership contracts that Elkside had signed.

The only other fact that the majority identifies in support of an inference that defendant somehow acted "improperly" is that the property had originally been listed for sale at $5.9 million, more than a decade earlier, but had been reduced over time to $1.995 million, the price at which it sat for four years before defendant purchased it. The majority uses that price history, combined with the fact that the existence of the membership contracts had been disclosed to potential buyers, to outline a theory by which defendant must have known that the property was available

for $1.995 million only because plaintiffs' interests ran with the land.

But we do not know how Elkside arrived at the initial list price of $5.9 million, whether that was ever a reasonable measure of the property's value, or how many buyers ever expressed interest at that price. Thus, the $5.9 million figure has no significance as a benchmark on this record. Further, as the majority acknowledges, the record reflects that potential buyers of the campground over the years were turned off for reasons other than the membership contracts.[6] When asked "what was the impediment in selling this park," Scott Krause, the broker who sold the property, testified that the park had "a lot going on. There's a restaurant, there's the villas, there's the memberships, there's, you know, a grocery store, you got boat rentals, bike rentals." He elaborated that "the villas, the restaurant, and the membership[s] were really the three things that was hard to get buyers to understand and get comfortable with." For those reasons, there is no basis for reasonably inferring anything about the "true" value of the property in the absence of the membership contracts.

Nonetheless, even if one were to assume that, without the membership contracts, the property might have sold for more than $1.995 million in the 13 years it was for sale before defendant purchased it, it does not follow that defendant somehow "knew" that plaintiffs had enforceable property rights. On the contrary, defendant may have seen an opportunity to acquire an asset that, in defendant's view, the market had undervalued because of potential buyers' *erroneous* legal understanding that the memberships ran with the land. The absence of recorded encumbrances on the property could have produced legitimate uncertainty among different buyers about the legal nature of plaintiffs' rights. Rational buyers could weigh that uncertainty differently and make different risk-reward calculations affecting the price they would be willing to pay for the campground. On this record, therefore, it requires conjecture to conclude that

---

[6] To the extent that the majority relies on the $2.8 million appraisal, the majority notes that it is unclear whether the appraiser was even aware of the membership contracts; thus, the record does not reflect what value the appraiser may have attached to them.

defendant subjectively "knew" that plaintiffs had enforceable interests running with the land.

The implications of the majority's decision are significant. Reasonable people value assets differently and may find mutual benefit in a transaction that, to an observer in hindsight, might seem questionable. Individuals conducting arm's-length transactions involving elderly persons now subject themselves to a claim for elder abuse—and the attendant expenses of litigation, including treble damages and attorney fees—if a jury could later say that a transaction was "injurious," "unfair," or "unjust." The prospect of treble damages based on a retrospective judgment that a transaction was "unfair" will inevitably discourage people from doing business with seniors in the first place. Perhaps worse, relatives and caregivers may become more reluctant to lend certain forms of support for fear that, the more deeply they become involved in the lives of the elderly, the greater the risk a jury will later find that some aspect of their involvement was "unfair" or "unjust." This cannot be what the legislature hoped to accomplish. I respectfully dissent.

Duncan and DeHoog, JJ., join in this opinion.